CLEVELAND & AURORA MINERAL LAND COMPANY v. Ross *et al.*, *Appellants*.

Division Two, June 16, 1896.

1. **Practice:** ORAL EVIDENCE: DIRECTING VERDICT. Where all of the testimony produced by the plaintiff is oral, it is error to direct a verdict for him, it being for the jury to say whether the witnesses are to be believed.

2. **Mining Claim:** STATUTE: FORFEITURE: QUESTION FOR JURY. Where the right of the owner of mining lands to recover the same of persons in possession, under Revised Statutes, 1889, sections 7034, 7035, depends on whether they had forfeited their rights by failing for ten days in one month to work the mine, or to pay royalty on demand, and the evidence is conflicting as to whether the cleaning of "chats" constituted working the mine, and as to whether there was a waiver of the immediate payment of the royalty on demand, the questions are proper ones for the jury, and it is error to direct a verdict.

*Appeal from Lawrence Circuit Court.*—HON. W. M. ROBINSON, Judge.

REVERSED AND REMANDED.

*Wm. B. Skinner, H. H. Bloss*, and *Cloud & Davies* for appellants.

(1) Competent evidence, which tends to prove or may form a part of the proof of the matters in issue, should not be excluded. 1 Thompson on Trials, sec. 386. (2) The object of judicial investigations is the truth, and the tendency of modern ruling is, under reasonable rules, to exclude nothing that can throw light upon the transaction. *Coughlin v. Haeussler*, 50 Mo. 128. (3) In trials before juries, the rule is that where there is any evidence, however slight, and whether direct or inferential, which tends to establish the complaint or

defense, from which the jury might reasonably infer the essential fact, the court should not take the case from the jury. *Twohey v. Fruin*, 96 Mo. 104, and cases cited; *Buesching v. Gaslight Co.*, 73 Mo. 231; *Soeder v. Railroad*, 100 Mo. 673; *Charles v. Patch*, 87 Mo. 451; *Taylor v. Short*, 38 Mo. App. 24. (4) The jury are, as a rule, the exclusive judges of the weight and probative force of the evidence. *State v. Jackson*, 99 Mo. 60, and cases cited above.

*Carr McNatt* and *Henry Brumback* for respondent.

(1) There was no conflict in the evidence, and it only remained for the court to determine, as a question of law, whether the acts proved to have been done during the eleven and more days in March amount to a "working the mine," in the sense and meaning of the statute, and if so, whether the notice given on February 5 was an act on the part of plaintiff such as justifiably caused defendants to fail to work the mine from March 4 to March 18. Whether there is any evidence, or what its legal effect may be, is to be declared by the court. *Callahan v. Warne*, 40 Mo. 137. See, also, *Powell v. Railroad*, 76 Mo. 83; *Commissioners v. Clark*, 94 U. S. 284. "The proper conclusion to be drawn from a conceded" state of facts admitting of but one reasonable inference, is always a question for the court. *Selz v. Collins*, 55 Mo. App. 62; *O'Malley v. Railroad*, 113 Mo. 319. (2) These parties exercised their liberty to make a contract in the terms of the mining statute, and the court can not make a different one for them, but will hold them to the terms of their own choosing. *Beattie v. Coal Company*, 56 Mo. App. 221.

BURGESS, J.—Ejectment for possession of a mining lot numbered 28, of the "Bonanza Tract," being two hundred feet east and west by two hundred and twenty-

three feet on the west end north and south, and two hundred and ten feet on the east end, in Lawrence county.    Ouster is laid March 25, 1893.

The answer, after a general denial, avers that in September, 1891, with the knowledge, permission, and consent of the then owners, defendants entered the premises to dig for lead and other ore, and in good faith dug and opened shafts, extended and operated drifts therefrom, and have ever since been in possession for the purpose of mining under, and in accordance with, the provisions of section 7035, Revised Statutes, 1889, and have erected buildings and machinery on the surface, and have made no other claim than such as was necessary to carry on such mining operations.

Plaintiff, in its reply to defendants' answer, alleges that after defendants entered and commenced work, they failed and neglected to work, or cause to be worked, their shaft, mine, drift, or deposit of mineral for ten days, not including Sundays, in the calendar month of March, 1893, viz.: From March 1 to March 18, without such failure and neglect having been caused by unavoidable circumstances, or by the act of plaintiff, and without plaintiff having consented thereto, and thereby defendants have forfeited all right to work or hold the premises; and, second, that defendants have failed and refused, when demanded by plaintiff, to pay royalty to the plaintiff on the ores and mineral by them mined from the premises, and thereby they have forfeited their right.

The trial was before a jury, and after the evidence was all in, under a peremptory instruction by the court directing them so to do, they returned a verdict for plaintiff, upon which judgment was rendered, and defendant appealed.

It was stipulated between the parties at the trial that they claim title through the same common source,

to wit, John S. Wilson, Carr McNatt, Brinkenhoff Mining Company, Warren Vertrees, R. R. Lyon, and J. R. Simmons, and that in September, 1891, A. Y. Ross, J. B. Ross, and E. H. Williams went into the ground, at which time said McNatt was acting as the agent and representing said Lyon and Simmons with respect thereto.

Plaintiff showed legal title to the land described in the petition.

The evidence on the part of defendants tended to show that prior to September, 1891, Wilson, McNatt, Brinkenhoff Mining Company, Vertrees, Lyon, and Simmons, had staked a tract of land of nine acres off into mining lots two hundred feet square for mining purposes, and that the lot in question is one of those lots. They had no written or printed rules, but permitted miners to enter upon the lots and prospect for mineral under the statutes of the state, reserving to themselves a royalty of twenty per cent on the mineral mined. In the fall of 1890, at which time said Vertrees was one of the owners, and superintendent of the land, and before McNatt took charge of it, one Connett went on the land with the permission of Vertrees and in connection with one Adams commenced to sink a shaft. In March, 1891, they sold a one third interest of their claim to E. H. Williams and the three continued to work the shaft until September, 1891.

In the early part of September, 1891, Vertrees ceased to be superintendent, and after that McNatt was superintendent, and gave permission for persons to mine on the lots. In the same month E. H. Williams, A. Y. Ross, and J. B. Ross purchased the mining property and succeeded to the rights of Connett, Adams, and E. H. Williams. E. H. Williams and J. B. Ross went to see McNatt, who was then agent for the land to arrange about it and made an arrangement with him to mine

the lot, by which he agreed to reduce the royalty to fifteen per cent, and in pursuance of this arrangement they went on mining.

After the arrangement with McNatt defendants claim to have acquired from one Drake the lot immediately east of and adjoining the lot in question and the right to mine the same through the drifts and shaft upon the lot in question, by and with the consent of McNatt, the agent and representative of plaintiffs. There was no proof, however, that McNatt ever consented to this arrangement or that plaintiff ever did, except as hereinafter stated.

Defendants had erected a number of sheds, buildings, and machinery, such as is usually used in the kind of mining in which they were engaged on lot 28, and were operating the same at the time plaintiff was incorporated and become the owner of both of said lots. And when H. J. Baldwin, one of said corporators, and its representative and agent, was thereafter looking over said premises, and getting the names and claims of the miners operating the lands acquired by plaintiff, J. B. Ross showed him the boundaries of the claim of defendants and they thereafter paid to him the royalty, and continued to do so and mine the ground until about the first of February, 1893, when Baldwin suggested that they give up their lease and pay him twenty per cent royalty instead of fifteen, which they had been paying under their contract with McNatt, stating at the time if they did not then surrender the old lease and enter into a new contract with plaintiff and pay twenty per cent royalty, that when their lease was out he would not let them have it for another term. They declined to accede to this proposition, and on February 5, 1893, plaintiff served on defendants the following notice.

"AURORA, Mo., February 5, 1893.
"*To A. J. Ross, J. B. Ross, S. H. Horine, and Pat. H. Oliver:*

"GENTLEMEN:—You are hereby notified that we are informed that where you are now mining is on the east lot where you have no right to mine on.   You are requested to stop mining and if you do not you will be held for damages.

"You are further notified that your right to mine on the west lot will terminate the twenty-fifth of March, 1893.   At which time you will be required to cease mining on that lot and remove your buildings, machinery, etc., therefrom.

"CLEVELAND & AURORA MINERAL LAND CO.
"By C. F. JOHNSON, Supt." .

On February 25, 1893, defendants stopped digging ore, running their engine, hoister, crusher, discharged their superintendent and hands, except that between that date and March 4, they had two of their hands, Stone and Bell, to wash up the rock on top of the ground, which had been previously crushed. This part of the mining ceased on either the last day of February or first day of March.   When this washing. of crushed rock ceased, nothing further was done between that date and March 18, except that one of the defendants and Pat. Oliver, were hauling to another plant and there cleaning up the "chats."   On March 18, Wooliver and Barker went into the drifts, but through the Monarch shaft on other ground than the shaft on the lot in question, and did drilling and shoveling for two to three weeks, and during this time the pump, hoister, and other departments of mining were none of them operated.

Defendant's first contention is that the court committed error in taking the case from the jury, and in directing them to find a verdict for plaintiff.

In *Wolff v. Campbell*, 110 Mo: 114, the trial court directed a verdict for plaintiff, and refused all the instructions asked by the defendant, and in passing upon the action of the court in this regard it is said: "There are cases where such an instruction may properly be given; as where the plaintiff's case, under the pleadings, turns wholly on the construction of a contract, the construction of which is simply a question of law; or where the answer admits the plaintiff's cause of action and sets up new matter as a defense, and the evidence fails to make out a *prima facie* defense. Ordinarily, where the plaintiff produces parol evidence to support his action, the issue of fact should be submitted to the jury. The evidence may be all one way, yet it is for the jury to say whether they believe the witnesses or not. The court has no right to tell the jury they must believe the witnesses. It was so held and ruled at an early day by this court. *Bryan v. Wear*, 4 Mo. 106, approved in *Vaulx v. Campbell*, 8 Mo. 224, and in *Gregory v. Chambers*, 78 Mo. 294."

In the case in hand, no question is involved as to any writing, nor is there anything in the pleadings which takes the case out of the general rule announced in that case, and under that ruling the judgment must be reversed and the cause remanded for further trial.

But there are additional reasons why the judgment must be reversed.

The issues presented are: *First*, did the defendants forfeit their right to mine and to hold possession of the lot named in the petition by first failing or neglecting to work or cause to be worked their shaft, mine, prospect, or deposit of mineral for ten days, not including Sundays, in the calendar month of March, 1893, and if they did so fail was such failure or neglect caused by the act of the owner? *Second*, did they

forfeit their right by failing to pay royalty, on their ores, when demanded by plaintiff?

Section 7034, Revised Statutes, 1889, is as follows: "When any person owning real estate in this state, or any person having a leasehold interest in such real estate for mining purposes by lease from the owner thereof, duly acknowledged and recorded in the county wherein the land lies, shall permit any person or persons, other than their servants, agents, or employees, to enter and dig or mine thereon for lead, ore, or other minerals, with the consent of such owner or owners or lessee, he or they shall keep a printed statement of the terms, conditions, and requirements upon which such lands may be mined or prospected, and the time during which the right to mine or prospect thereunder shall continue, posted or hung up in a conspicuous place, in plain, legible characters, in the principal office or place of business of such person or company in the county in which said lands are situated, or in a county contiguous thereto, and shall deliver to any person mining or prospecting, or about to mine or prospect on said lands, and requesting it, a printed copy of such statement; all persons digging or mining on said lands, after the posting up of such statement, shall be deemed to have agreed to and accepted the terms thereof, and shall, together with such owner or lessee, be bound thereby, and upon failure or refusal to comply with the terms, conditions, and requirements of such statement, he or they shall forfeit all right thereunder; and the owner or lessee, as aforesaid, of such lands, may re-enter thereon and take possession of the same, nor shall the receipt of any ore or mineral by any such owner or lessee, after any such forfeiture has been incurred, be deemed or taken as a waiver of such forfeiture."

Section 7035, Revised Statutes, provides that any

person or persons mining as aforesaid who shall fail or neglect to work or cause to be worked such shaft, mine, quarry, prospect, or deposit of mineral for ten days, not including Sundays, in any one calendar month, after commencing said work, shall forfeit all rights to work, mine, or hold the same as against such owner or lessee, unless such failure or neglect was caused by unavoidable circumstances, or by the act of such owner or lessee or his agent, or unless such owner or lessee consent thereto.   Or if any person so mining, shall fail to pay the owner or lessee of the lands, the royalty for mining thereon, at least once every month, if demanded by such owner or lessee, by delivering the same to him at or near the mouth or opening of such mine, shaft or quarry, or at the usual place of business of such owner or lessee, or at any other place that may be agreed upon by such miner and owner or lessee, or the value of such royalty in cash, such lessee shall forfeit all right to mine the land, and the owner or lessee may enter and take possession of the land.

Plaintiff insists that there were eleven days in March, 1893, between the fourth and eighteenth days of that month not including Sundays, during which the defendants failed and neglected to work said mine, and that by reason of such failure they forfeited their rights, which at once entitled it to possession, unless the mere hauling away and cleaning up chat, during that time was working the shaft, mine, quarry, prospect, or deposit of mineral, within the meaning of section 7035, *supra*, which provides for a forfeiture of the right to mine for failure to cause to be worked the shaft, mine, quarry, prospect, or deposit of mineral for ten days, not including Sundays, in any one calendar month after commencing work.

With respect to the "chats," Louis Hubbell, a

witness for defendants, testified as follows: "Chats are not cleaned up; chats are mineral and rocks all mixed up. It has to be crushed and cleaned before it is sold as mineral. After it is crushed and run through the jigs, the product is sold as mineral. When chats are spoken of, it is the mineral and rock combined. It is not the same as tailings. It is the portion not separated, and thrown aside for future milling or handling."

According to this evidence it seems to us that cleaning chat is a part of the process of mining and preparing the mineral in which defendants were engaged in mining for market. It does not seem to be marketable without, and, in order to cleanse it, it must be crushed and run through a jig in order to separate the mineral from the rock, dirt, and other foreign substances. After having gone through these processes it is sold, and upon the proceeds arising from such sale, plaintiff is entitled to its royalty. We are not inclined to give to the words of the statute that rigid construction for which plaintiff insists, but in any event under the state of the evidence defendants were entitled to have the case go to the jury, and to have them say whether or not hauling and cleaning chats come within the meaning of the words of the statute quoted.

Another contention on the part of plaintiff is that, as the evidence showed that C. W. Westcott bought of defendants in the latter part of February, 1893, twenty-one hundred and twenty pounds of lead taken from this lot and paid for it, the royalty on which was something over $6, and that defendant J. B. Ross failed to pay it to plaintiff on demand of its superintendent made between the first and tenth of March, 1893, they forfeited their rights as miners, which also entitled plaintiff to possession.

With regard to the failure to pay the royalty by

defendants, J. B. Ross, one of the defendants testified as follows:

"I was up at the Bonanza ground one day and Mr. Johnson (plaintiff's superintendent) came along; we talked about the Independent; he says, 'I see you are not running over there;' we talked about the matter and I went on and explained why we were not actively and fully engaged. He either spoke to me or I to him, I don't know which brought it up, but I rather believe Mr. Johnson did, with regard to the lot. He said he believed there had been a little lead turned in on which there had been no royalty paid. I said, 'Yes, there has been a little lead turned in,' but from some cause I had failed to send a check for the royalty then, and I said, 'I am ready to give you a check for it any minute, for the money is in the bank;' it was some six dollars and something. But, I said, 'I am having some chats cleaned up from the Independent, and if you let the matter run till we get the chats cleaned up, I will pay it all.' He said, 'I didn't know you had any.' He said, "I thought you cleaned your own chats,' and then he said, 'All right, any time you find out how much there is after you get your chats cleaned up, you send me a check for the money.' I mailed him a check for the royalty on some chats and this lead and some other stuff; mailed it to Mr. Johnson and he returned it to me, and I deposited it in the Miners & Mechanics Bank to their credit."

According to this evidence plaintiff waived any forfeiture by reason of defendant's failure to pay the royalty due up to the time the conversation is said to have occurred between the defendant Ross and Johnson, plaintiff's superintendent, in respect to which Ross testified that Johnson said, "Any time you find out how much there is after you get your chats cleaned up, you send me a check for the money."

State ex rel. v. Heege.

It is true Johnson's evidence seems to be in conflict with that of Ross, but the weight of the evidence was for the jury and not for the court. They may have preferred to believe Ross to Johnson, and in that event could but have found for defendants upon that issue.

Under the facts disclosed by the record, plaintiff was not entitled to recover possession of the premises sued for upon any other ground than that of forfeiture of their rights by defendants for one of the causes alleged by plaintiff in its replication, which under the evidence should have been submitted to the jury. The judgment is reversed and the cause remanded. GANTT, P. J., and SHERWOOD, J., concur.