# KING v. DOANE.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

No. 77. Argued November 14, 1890. — Decided March 2, 1891.

The mere renewal of a negotiable promissory note does not, as between the original parties, affect the essential nature of the transaction represented by it.

If, in an action by an endorsee against the maker of a negotiable promissory note, the note is shown to have been obtained by fraud, the presumption, arising merely from the possession of the instrument, that the holder in good faith paid value, is so far overcome that he cannot have judgment unless it appears affirmatively from all the evidence, whether produced by the one side or the other, that he in fact purchased for value.

The rule which protects a *bona fide* holder for value of commercial paper against defences or equities, that might be good, as between the original parties, does not require that the holder shall have paid full value : but if the amount paid is greatly disproportioned to the real value, the security may be regarded as having been obtained without paying anything for it.

King agreed to take $10,000, par value, of the capital stock of a corporation being organized, and to pay $6666.66 for it. He executed his promissory note for the latter amount that it might be discounted and the proceeds applied on his subscription, his stock to be held as security until the note should be paid. Doane, who had already subscribed and paid his subscription, surrendered 100 shares to the company, which were allotted to King, and a certificate issued to him therefor, which certificate, being endorsed by him in blank, was given, with the note, to Doane as security for the payment of it, in consideration of his surrender of the 100 shares. At maturity the note not being paid, a note of $7118.50 was given in renewal. King being sued on the renewal note, set up that he had been induced to make the subscription by false and fraudulent representation on the part of an agent of the company, and that Doane had not paid full value for the note. *Held*, that Doane had purchased the original note for value, and without knowledge or notice of any fraud or bad faith in the transaction, and could recover.

THE case is stated in the opinion.

*Mr. M. P. Brewer* for plaintiff in error. *Mr. F. B. Hart* was with him on the brief.

*Mr. W. E. Hale* for defendant in error. *Mr. John M. Miller* was with him on the brief.

Mr. Justice Harlan delivered the opinion of the court.

This action was brought to recover the amount due on a promissory note executed November 10, 1884, by King for the sum of $7118.50, and made payable to the plaintiff Doane or his order one year after date, with interest at the rate of seven per cent per annum from date until paid. By direction of the court the jury returned a verdict in favor of the plaintiff for the full amount of the note, with interest. A new trial having been refused, judgment was entered in conformity with the verdict. 30 Fed. Rep. 106.

The defence is, that the note sued on had no other consideration than the surrender and cancellation of a previous note alleged to have been obtained, with the knowledge and aid of Doane, by fraud and false representations; that the endorsement and transfer of the original note to him was wholly without consideration; and that the renewal note was executed by King in ignorance of the fraud perpetrated on him, and because of the false statement by Doane, through his agent, that he was the *bona fide* holder of the first note.

The principal facts out of which this litigation has arisen are as follows: During the fall of 1883, King, the plaintiff in error, had frequent interviews with one Frank B. Felt in reference to the purchase, by the former, at the price of $6666.66, of ten thousand dollars, par value, of the capital stock of the Pullman Iron and Steel Company, a corporation then recently organized under the general laws of Illinois with a capital stock of $500,000 divided into 5000 shares of $100 each, for the purpose of manufacturing iron and steel in different forms, principally the bayonet railway spike for which a patent had been issued to J. P. Perkins. This patent, at the time of the organization of the company, belonged to Felt, Perkins, J. W. Doane and James N. Smith, the latter representing, it is alleged, George M. Pullman. Felt, Doane, Perkins and Smith constituted a majority of the directors, and Felt was the secre-

tary and treasurer of the corporation. It does not appear that King made a formal written subscription of stock. But, under date of November 7, 1883, Felt wrote to him : " If convenient, please remit one-half amount of subscription to stock, amounting to $3333.33. Any time before the 15th will answer. We are progressing finely and everything looks very flattering, having had applications from three companies to start other works at different places. I am confident we have the best thing in the country, and the outcome will make us happy; will see you about the 25th, and advise you of progress and the decision of directors as to starting other companies, either in stock or royalty." King replied under date of the 10th: " Yours of the 7th at hand. I have a deal on hand which ought and, I believe, will pan out before the 15th, and I will respond as soon as it does. I expect to be in Chicago very soon; next week possibly, and certainly not later than the week following. Will it answer if I make the payment then? You have no idea how d—d tight money is up here, and I sometimes feel like getting tight myself, but I think I am sure of being easy in a few days; glad to know of the promising outlook. Let me hear from you." This was followed by further correspondence, in which Felt urged King to pay the assessment made upon him, while King promised payment as soon as he could make arrangements for the money. In those letters Felt expressed high hopes for the future of the company. Under date of February 18, 1884, King wrote to him : " I appreciate the situation as you describe it, and have delayed writing until this time, hoping to bring a settlement of the matter in which I have the funds you need and considerably more locked up, but can't do it, and must therefore come back to first principles and do the best I can, viz. : I will send you my note for the amount, $6666.66 due October 1, 1884, at 8 per cent, and until it is paid you may hold the $10,000 of stock as security, giving me a receipt showing what the transaction is. Your security will thus be ample and you can discount the note to meet present needs. If I can get funds in, as I hope and expect to do, at an earlier date than above named, would be glad to take the note up before maturity, of

course, but must fix a time which will render it certain that I shall not disappoint you or be disappointed myself. I trust that you can arrange matters on this basis, and, if so, will close it up at once." In a letter of February 22, 1884, Felt inclosed a note to be signed by King, dated January 5, 1884, for $6666.66, payable on the 1st of October thereafter to the order of the Pullman Iron and Steel Company at the First National Bank, Minneapolis, with interest at the rate of 8 per cent per annum until paid. This note was signed by King and returned to Felt in a letter of February 25, 1884, in which King said: "Yours of the 22d at hand, and I herewith return the note, duly signed. Please return a receipt, which will cover the transaction and show that you hold my $10,000 of full-paid stock as security for the payment of said note, so that in case either of us should be snuffed out meanwhile our administrators might have an easy job. Am delighted to know of the brilliant prospects of the company, and trust it will pan even larger than you anticipate. Our electric light business is climbing." Felt, as treasurer, delivered to King a receipt, dated March 1, 1884, showing that, when the above note was paid, "full-paid stock is to be issued" to him "for $10,000 in the Pullman Iron and Steel Company."

On the 19th of April, 1884, the company issued to King a certificate of 100 shares of stock, and it was inclosed the same day to King, in a letter from Felt, in which the latter said: "Please endorse in blank on back of the same. Mr. Doane advanced the money on it, and this is to be held by him until note is paid, when stock will be returned to you. This should have been done when note was made, but just made our issue of stock and now do this to close up the books. We are running in good shape. The leading iron man of the country, after looking over our works last night, said he thought the stock would double in a year and double again, and pay good interest on the same. We are having large demand. Please sign and return at once." King, as requested, executed an assignment, in blank, of the certificate, and returned it to Felt in a letter of April 24, in which he said: "Your favor of 19th, enclosing certificate No. 31 for 100 shares of the capital stock·

of the Pullman Iron and Steel Company in my name, is just received, and, as requested by you, I herewith return it, endorsed in blank, to be held by Mr. Doane until my note of January 5, 1884, for $6666.66, due October 1, 1884, is paid, when said certificate is to be returned to me. Am delighted to hear of the flattering prospects of the company. The value of the stock can't double too often to suit."

The explanation given by Felt of the transaction by which Doane got King's note as collateral was, that while, in consideration of the transfer by Doane, Perkins, Smith and himself to the company of the patent for the bayonet spike, the original stock was divided equally between them on the basis of 1250 shares to each, one-half of the stock was donated to the treasury of the company to be sold, the proceeds to be used in building a plant and as a working capital for the company. Felt testified: "I, as an officer of the company, received it [the note] from Mr. King. Soon after the receipt of this note it became necessary for the company to have funds, and it was assumed that I, as one of the interested parties to [in] this company, should provide a certain amount of money by the sale of stock, and Mr. Doane, claiming that I had not provided the full amount, offered to discount my own note and take this note of Thomas S. King as a collateral against the same. Soon after the execution of my note to J. W. Doane he asked me if I wished to hold this note of King's and dispose of my own stock, I having raised the money necessary to cover the amount of this subscription; if not, he would take the note and assign to Thomas S. King one hundred shares of his stock. This was before the company had commenced operations, and it looked as if it would be a very profitable institution, and I told him that I did not care to dispose of any of my stock. So, on April 19, 1884, J. W. Doane transferred 100 shares of his stock. The same was assigned to T. S. King and held as collateral by J. W. Doane against the note given by King. The note that I gave to J. W. Doane, upon which the money was advanced, has been paid by me."

In explanation of the statement that he was to provide a certain amount of money by the sale of stock, Felt said: "It

was agreed that fifteen hundred shares of the stock should be sold at a certain price; one-half of said stock being taken by the two subscribers. Upon my coming to Chicago I found that it was understood that Mr. Perkins and myself were to place the other one-half of the stock."

The note discounted by Doane, with the King stock as collateral, was executed by Felt, individually, March 8, 1884, and was paid about September 1, 1884. Being asked to explain the transfer by Doane of one hundred shares of stock, Felt said: "That was done by a certificate of transfer, under date of April 19, 1884, to Thomas S. King by J. W. Doane, Mr. Doane surrendered his certificate of 625 shares, dated April 12, 1884, and a new certificate was issued to him for five hundred and twenty-five shares, under date of April 19, 1884, being the amount of his original certificate of shares, less the amount transferred to Thomas S. King, and a certificate of one hundred shares was issued to King. The certificate of stock was signed by W. E. Barrows, vice-president, and Frank B. Felt, secretary." Of the 2500 shares transferred to Felt, as trustee, fifteen hundred shares were sold at sixty-six and two-thirds cents on the dollar, the proceeds of the same being used to erect a manufacturing plant. The remaining one thousand shares were intended to be held and sold at par for an operating capital. Doane took 375 shares, paying in cash therefor the sum of $25,000. A like amount, at the same price, was taken by Pullman, and paid for by him or through the Pullman Palace Car Company.

When the note of January 5, 1884, became due, King received notice of its being in bank for collection. He says: "I had reason to believe it was in Chicago, and the fact that there was no sale for the stock was a disappointment to me, but I presumed that Mr. Doane was the innocent holder of the note for value. I knew none of the facts upon which I now base my defence. The note was claimed and represented to be the property of Mr. Doane at that time. I was unable to pay it, and renewed it for the one sued upon in this case, [for $7118.50, dated November 10, 1884,] payable to J. W. Doane. The difference in the amounts of the two notes is

accounted for by the interest being added.   Additional security
was demanded of me, and I gave, in addition to the Pullman
Iron and Steel Company stock held by Doane, $8500 of stock
in the Brush Electric Company.   There was no new consider-
ation for the last note.   It was simply a renewal and extension
of time."

Giving the defendant the benefit of every reasonable infer-
ence from the evidence, did the court below err in directing a
verdict for the plaintiff?   It was proven beyond question that
the defendant agreed to take $10,000, par value, of the capital
stock of the Pullman Steel and Iron Company, and pay for it
the sum of $6666.66; that he executed the note of January 5,
1884, for the latter amount that it might be discounted, and
the proceeds applied on his subscription, the stock subscribed
to be held as security until the note was paid and a certificate
of stock, full paid, to be issued to King upon such payment
being made; that a certificate for 100 shares, surrendered by
Doane, was issued to King, by whom it was assigned, in blank,
to Doane, to be held by the latter as collateral security for
the note of January 5, 1884; that the note was endorsed and
delivered to Doane, in consideration of his having surrendered
to the company the above 100 shares of his full-paid stock;
and that, subsequently, the note sued on for $7118.50 was
given in renewal of the note for $6666.66.

If King was induced by false or fraudulent statements of
Felt, representing the company, to subscribe for stock and to
make the note for $6666.66, he would not have been liable as
between himself and the company either on the subscription
or on the note.   Nor would he have been liable to the com-
pany upon any note taken by it simply in renewal.   The prin-
ciple is well established that, as between the maker and payee,
any defence that would be good against the original note will
be equally good against a note taken in renewal without addi-
tional consideration, or under circumstances not showing a
valid waiver of such defence.   The mere renewal of a note does
not, as between the original parties, affect the essential nature
of the transaction represented by it.   *McLaughlin* v. *Bank of
Potomac,* 7 How. 220, 228; *Jones* v. *Guaranty and Indemnity*

*Co.,* 101 U. S. 622, 630; *Sawyer* v. *Wiswell,* 9 Allen, 39, 42; *Holden* v. *Cosgrove,* 12 Gray, 216, 217. If the subscription and original note were obtained by fraud, these principles would determine this case adversely to Doane unless he gave value for the original note without notice of the alleged fraud. Whether he did or did not give value, without such notice, is the vital question in the case. And that question must be considered with reference to the established rule, that if in an action by an indorsee against the maker a negotiable note is shown to have been obtained by fraud, the presumption, arising merely from the possession of the instrument, that the holder in good faith paid value is so far overcome that he cannot have judgment unless it appears affirmatively from all the evidence, whether produced by the one side or the other, that he, in fact, purchased for value. *Smith* v. *Sac County,* 11 Wall. 139, 148; *Commissioners* v. *Clark,* 94 U. S. 278, 285; *Stewart* v. *Lansing,* 104 U. S. 505, 509; *Pana* v. *Bowler,* 107 U. S. 529, 542. In the case supposed he must show that he paid value. That fact being established, he will be entitled to recover, unless it is proved that he purchased with actual notice of defect in the title, or in bad faith, implying guilty knowledge or wilful ignorance. *Goodman* v. *Simonds,* 20 How. 343, 367; *Murray* v. *Lardner,* 2 Wall. 110, 121; *Hotchkiss* v. *National Bank,* 21 Wall. 354, 359; *New Orleans* v. *Montgomery,* 95 U. S. 18; *Swift* v. *Smith,* 102 U. S. 442, 444.

It is argued that the evidence does not show the payment of value by Doane. We lay out of view altogether the fact that the original note may have first come to his hands as collateral security for Felt's individual note of March 5, 1884; for it does not distinctly appear that the delivery to Doane, for that purpose, of King's note was with the assent of the company; and without such assent, Doane could not rightfully have taken it as security for Felt's debt to him. The money advanced by Doane upon Felt's individual note was advanced to the latter in order that he might perform his promise to "place" a part of the stock donated to the company, and put in his hands, as trustee, for sale. But did not Doane pay value when he surrendered one hundred shares of

the original stock issued to him on account of his part owner-ship of the patent right transferred to the company? That stock was deemed of value by him; for, as we have seen, of the shares donated by the original stockholders to the company's treasury, he took 375 shares, paying therefor in cash twenty-five thousand dollars. When the transaction took place he had substantial reasons for believing, and so far as the evidence shows, in good faith believed, that the patent right in question was of value. And his confidence in the enterprise was manifested by the large sum invested by him. The question as to his having paid value does not depend upon the inquiry whether the result of the company's opera-tions justified the high expectations for its success that were indulged at the outset. And the rule that protects a *bona fide* holder for value of commercial paper against defences or equities that might be good, as between the original parties, does not require that the holder shall have paid full value. As said in *Gould* v. *Segee*, 5 Duer, 260, 270, " when a parting with value is proved, the amount of the consideration is not otherwise important than as bearing on the question of actual or constructive notice." So, in *Baily* v. *Smith*, 14 Ohio St. 396, 402, the Supreme court of Ohio held that the rule does not require the full face of the paper to be paid, and that a con-trary principle would not only deprive commercial paper of one of the most essential and valuable incidents of negotiability, but would disastrously affect the business and commerce of the country. We do not mean to say that the real amount of the consideration paid by the holder may not, under some circumstances, be important in determining whether, within the rule adverted to, he paid value. The amount paid may have been so disproportioned to the real value of the security purchased that the claim to have paid value will be treated as a mere pretence, and the security as having been obtained without paying anything for it. But no such case is here pre-sented. It is idle to say that what Doane paid for the note was, at the time, so insignificant as compared with the face or real value of King's note that a presumption arises that he had notice of some defence upon the part of King. The stock

surrendered by him to be issued to King was his individual property, and was deemed by him of equal value with the note; for he had taken and paid for 375 shares at the same rate, per share, that King·was to pay for the stock subscribed by him. The question of value is to be determined by the situation as it was, and as it was reasonably regarded, at the time Doane purchased the note. King had subscribed for $10,000 par value of the stock, and had given his note that it might be discounted and the proceeds applied on his subscription; and he expected that it would be discounted by Doane. Of these facts Doane was informed when he surrendered one hundred shares of his full-paid stock that it might be issued to King; for these matters appeared on the face of the transaction. And the evidence entirely fails to show that Doane had knowledge of any fraudulent representations by Felt or of any fact that would relieve King from obligation to meet his subscription or to pay the note executed by him to the company, or that Felt made any representations to King at the instance of Doane. King, so far as was known to Doane, had assumed to pay the whole amount of the original note, whatever may have been, at the time, the intrinsic value of the stock. The note was endorsed to Doane in consideration of his surrendering one hundred shares of his stock to be issued to King. It was precisely as if Doane had exchanged with the company (and it was competent for the parties to make such an exchange) one hundred shares of his full paid stock for King's note; in which case, King could not have escaped responsibility to Doane upon the note, unless it appeared that the latter did not become a *bona fide* holder for value.

The result is, that, under the evidence, Doane must have been deemed a holder for value. No other inference from the evidence could reasonably have been made. Having, then, purchased the original note for value, Doane was entitled to recover the amount of the renewal note, unless it appeared that he purchased the original note with knowledge of the fraud alleged to have been committed against King, or with such notice of the facts and circumstances attending its execution that his purchase of it must be deemed to have been

made, not simply without due care, but in actual bad faith. As such knowledge or notice was not shown, and could not be reasonably inferred from the evidence, the direction to the jury to find for the plaintiff was proper.

*Judgment affirmed.*