# THURSTON v. McLELLAN.

APPEALS; FRAUDULENT TRANSFERS; BONA FIDE PURCHASERS; EVIDENCE.

1. On an appeal from a decree on the pleadings and testimony taken, dismissing a bill in equity, to establish the right of the complainant to a fund in the hands of executors, and to vacate as fraudulent an assignment thereof made to one of the defendants by another of the defendants, to whom the complainant had assigned the claim for collection, it is too late for the appellee, the alleged fraudulent assignee, to object for the first time on appeal that the bill was properly dismissed, on the ground that equity had no jurisdiction, as the complainant had an adequate remedy at law. (Following *Tyler* v. *Moses*, 13 App. D. C. 428.)

2. An objection, at the end of an answer in equity, that the complainant has not made out such a case as to entitle him to the relief prayed, and a prayer by the defendant that he may have the same benefit of the objection as though he had formally demurred to the bill, will not, when not acted upon in the court below, entitle the defendant to object, for the first time, on appeal, that the lower court was without jurisdiction to entertain the bill, on the ground that the complainant had an adequate remedy at law.

3. The fact that the owner of a claim against a decedent's estate made an assignment of it, absolute on its face, upon a secret agreement that the assignment was made merely for the purpose of collection, will not preclude the assignor from maintaining a suit in equity to set aside as fraudulent a transfer of the claim made by such assignee to a third party, on the theory that the complainant does not come into equity with clean hands.

4. *Semble.* An assignee of a non-negotiable instrument, who gives value and takes without notice of any equity against his assignor, nevertheless takes subject to such equity.

5. *Semble.* If the assignor of a claim against a decedent's estate clothes his assignee with written evidence of title, so as to enable him to appear to others as the true and beneficial owner, he is estopped to claim, as against a bona fide purchaser for value from such assignee, that the assignment was for purpose of collection only. (Following *National Safe Deposit Sav. & T. Co.* v. *Hibbs*, 32 App. D. C. 459.)

6. On proof by the assignor of a claim against a decedent's estate, assigned for purpose of collection, of equitable ownership and fraud on the part of the assignee in transferring the claim to a purchaser from him, the assignor makes out a prima facie case for the vacation of the alleged fraudulent transfer, which must be overcome by the purchaser proving that he purchased in good faith and for a valuable consideration.

7. In weighing testimony, courts are not bound to believe a fact or facts to be as testified to—especially if testified to by an interested witness—merely because the witness has not been directly contradicted or impeached; but the inherent probability or improbability of such fact or facts is to be tested by the unquestioned circumstances that surround the main transaction, as well as by the ordinary rules that govern human conduct. (Following *Beals* v. *Finkenbiner,* 12 App. D. C. 23.)

8. In a suit by the assignor of an allowed claim for $7,400 against a decedent's estate, which was being administered in this District, for purposes of suit, to set aside as fraudulent a transfer of the claim made by the assignee to an alleged bona fide purchaser for value, where the purchaser testified that he bought the claim in New York for $7,000, without making inquiry as to the validity of the alleged allowance of the claim and the solvency of the estate, and that he had no intimate acquaintance with the seller, who was under no obligation to him, and only knew him to be a "very eminently excellent man," whom he desired to help; and where it also appeared that the purchaser, although he disclaimed knowledge that a certain attorney named in the assignment had represented the seller in obtaining the allowance of the claim, and testified that he had never seen such attorney, nevertheless had engaged the attorney to defend the suit, it was *held* that he was not a bona fide purchaser, and the sale was set aside as fraudulent.

No. 2039. Submitted December 17, 1909.   Decided January 4, 1910.

HEARING on an appeal by the complainant from a decree of the Supreme Court of the District of Columbia, sitting as an equity court, dismissing a bill to establish the right of the complainant to a fund in the hands of certain of the defendants, executors of a decedent's estate, and to vacate as fraudulent a transfer of an assignment of the claim.      *Reversed.*

The facts are stated in the opinion.

Mr. *Charles F. Diggs* for the appellant.

Mr. *Henry E. Davis* for the appellee.

Mr. Chief Justice Shepard delivered the opinion of the Court:

Henry W. Thurston appeals from a decree dismissing a bill filed by him against Francis B. Clark and Charles W. McLellan, residents of the State of New York, and Henry F. Woodward and Mabel Grace McKay, residents of the District of Columbia. Woodward and Mabel Grace McKay are sued as executors of the estate of Nathaniel McKay, deceased, whose will was probated in the supreme court of said District.

Substantially, the bill alleges that complainant, having a claim of $41,211.69 against the estate of Nathaniel McKay, and living then in Georgia, gave a power of attorney to Clark to collect the same, and made him a written assignment of the claim. That Clark, having begun a suit in his name as assignee, compromised said claim for the sum of $12,500, which compromise was ratified by the probate court. By the terms of said compromise, the estate of McKay was allowed a credit of, say, $3,090 on account of principal and interest due on a mortgage formerly given by complainant to McKay. Two thousand dollars were paid to Clark in cash, leaving a balance of $7,350 unpaid, to all of which complainant is entitled. That Clark afterwards fraudulently assigned the sum due under the order establishing the same as a valid claim for payment by said executors, to defendant McLellan. That said assignment was a sham, intended for the purpose of enabling Clark to defraud complainant. Said balance is now in the hands of said executors, who, unless restrained, will pay the same to said McLellan under said fraudulent assignment. The prayers are that the fund in the possession of the executors be declared the property of complainant, and ordered paid to him; that the assignment aforesaid be annulled; that defendant Clark be ordered to deliver to complainant the said mortgage assigned

by the executors to him in said compromise; that Clark be required to account for the money received by him; and that an injunction be granted restraining the executors from making any payment of the fund to said Clark or McLellan. Clark made no answer, and a decree *pro confesso* was entered against him. McLellan answered under oath, alleging that he had purchased the said demand from Clark in good faith, without notice of any claim thereto by complainant, and for a valuable consideration.

It was contended on the argument for the appellee that the bill was properly dismissed, in any event, for the want of jurisdiction in equity, because it appears from the facts alleged that complainant had an adequate remedy at law against Clark, who is not alleged to be insolvent. It is difficult to perceive that a court of law could furnish an adequate remedy for the wrong complained of; but it is unnecessary to decide the question. No suggestion of the want of jurisdiction was made in the court below; for we cannot regard the question as raised by the last paragraph of the answer, which is "that complainant has not, in or by his said bill, made or stated such a case as does or ought to entitle him to the relief thereby prayed, or to any relief in the premises, and he prays the same benefit of this objection as though he had formally demurred to the said bill on account thereof."

This paragraph, if it be available as a demurrer at all, was not acted upon in the trial court; nor was any question as to the jurisdiction suggested or decided. Considering the allegations of the bill and the relief prayed, the objection, if ever available, clearly comes too late. *Tyler* v. *Moses,* 13 App. D. C. 428–442. The evidence, consisting largely of letters written by Clark to Thurston, shows beyond any doubt that Thurston remained the equitable owner of the assigned claim; that Clark prosecuted it to the compromise made with McKay's executors, and then in violation of his trust attempted to defraud him by making the assignment to McLellan. Without denying this, in so far as Clark is concerned, appellee contends that Thurston is barred of relief against the fraud of Clark

by the application of the principle, that he who comes into equity must come with clean hands. It is argued that the evidence shows that Thurston assigned to Clark for the purpose of enabling him to perpetrate a fraud upon McKay's executors. The charge of fraudulent purpose on the part of Thurston is founded on certain paragraphs in the letter from Clark to him, which he offered in evidence in proving his equitable title to the assigned claim and its proceeds. The evidence does not show what the business of Clark was, but his letters indicate that he had some information relating to the bringing of actions by assignees. Thurston lived in Georgia and appears to have had no means. Clark, who lived in New York, and was, evidently, often in Washington, had a claim of his own, of a comparatively small amount, against the McKay estate. He proposed to Thurston to make an assignment of his claim so that he might bring an action in his own name; he, Clark, assuming the burden and expense of its prosecution. In his earlier correspondence with Thurston, Clark informed him that he had begun proceedings to collect his debt, and had applied to the probate court to be appointed collector of the McKay estate, and suggested that he might be of service to Thurston through combining their claims. April 1, 1903, Clark wrote inclosing an assignment for execution by Thurston. This was not executed. May 4, Thurston wrote Clark, advising that he wished to protect him and would assign him the claim for suit at the latter's cost. He said: "You can sue the estate or collect in any manner you may deem best for the protection of your interests." He also briefly explained the justice of his claim and stated his confidence that the estate was solvent. Clark wrote saying: "My lawyers say they want to show that the assignment was made to me for value, and the larger the amount the better and more convincing it will be that it was made to me on legitimate transactions," etc. The instrument inclosed and which Thurston executed May 16, 1903, recited a consideration "for value received," and contained a power of attorney to Clark to demand and sue for the debt claimed, etc. Before this was executed, Clark wrote again saying that

he was "disappointed and hurt" by Thurston's failing to sign the assignment sent him for execution, and saying that it was important that it be signed and returned at once, as his attorney had been instructed to go ahead with the case in his name as assignee. It was on the statement, before recited, regarding making the assignment for full value, and the following statement in this letter of Clark, that the charge of fraud against Thurston is founded: "My several lawyers, after going into the case and getting an inkling of how matters stand, advised me that it was the only way in which to commence the suit and hope for success; that if I acted only as your attorney and the suit brought in your name, the other side would probably win in the end, and with a prospect of my being obliged to pay all charges and costs. ————— and his crowd are smart and tricky and could no doubt show that you were impecunious and dependent upon your uncle, and you could not prove it to the contrary, and your own lawyer friends would help defeat you.

"I have never thought of what I am going to get out of it. I took hold of it for you and with the intention of helping you and your family, and hoped to do something more for you, but since you have put the matter in a new light I feel like dropping the whole thing, and Mrs. Clark strongly advises it, as she has little hope of my prosecuting the case to a successful termination. What I have already done amounts to an outlay of over $2,500, and the Lord only knows how much more it will be necessary for me to pay out, if I continue the case, before the case is decided. Naturally I will look for a return of moneys paid out and lost and to lawyers and all charges and expenses incurred."

These letters rather indicate a scheme by Clark to obtain the legal title to the claim, that he might thereafter defraud Thurston and convert the proceeds to his own use. Thurston, under the pressure of poverty, apparently, and the artful persuasion of Clark, yielded to the latter's demand. Grant that his conduct was reprehensible in so far as he may have contemplated deceiving the executors of McKay, still it does not ap-

pear that he embarked in such a fraudulent scheme with Clark as to deprive himself of all remedy in equity for the subsequent fraud perpetrated upon him by Clark. There was no violation of law in assigning the same to Clark for suit. Moreover, no fraudulent advantage was obtained, or could be obtained, over the executors through the assignment, for they were deprived of no defense that they might have had in an action by Thurston. Clark doubtless knew this; and at any rate the attorneys, under whose suggestion he claimed to act, must have known it. Certainly, the executors of McKay, one of whom was a capable lawyer, could not have been prejudiced by the assignment. We are of the opinion that the conduct of Thurston does not bring him under the application of the principle, as contended.

This brings us to the consideration of the claim of McLellan to be an innocent purchaser from Clark for a valuable consideration. If this were the case merely of an assignee of a non-negotiable instrument, the assignee whether, for a valuable consideration or not, and without actual notice of any equities against his assignor, would nevertheless take subject thereto. The right of McLellan to the fund as against Thurston depends upon the question whether the latter is estopped, by his transaction with Clark, to set up his ownership against an innocent purchaser for value. If Thurston clothed Clark with written evidence of title so as to enable him to appear to others as the true and beneficial owner; and if McLellan, acting upon that representation of title in Clark, without notice of Thurston's equitable title, in good faith, and for a valuable consideration, purchased the same of Clark, then Thurston is estopped to recover in this suit, and his bill was properly dismissed. *Cowdrey* v. *Vandenburgh,* 101 U. S. 572– 575, 25 L. ed. 923–925; *National Safe Deposit Sav. & T. Co.* v. *Hibbs,* 32 App. D. C. 459–470; and cases there cited.

By proof of his equitable ownership, and the fraud of Clark, complainant made a prima facie case which entitled him to recover, unless overcome by McLellan's proof of purchase in good faith for a valuable consideration. *Seymour* v. *McKin-*

*stry,* 106 N. Y. 230–240, 12 N. E. 348, 14 N. E. 94. For a stronger reason, the rule is the same that governs in the case of an action by the indorsee of a negotiable instrument when fraud or illegality has been shown in its inception. *Collins* v. *Gilbert,* 94 U. S. 753, 754, 24 L. ed. 170, 171; *Stewart* v. *Lansing,* 104 U. S. 505–509, 26 L. ed. 866–868; *King* v. *Doane,* 139 U. S. 166–173, 35 L. ed. 84–87, 11 Sup. Ct. Rep. 465; *Lytle* v. *Lansing,* 147 U. S. 59–62, 37 L. ed. 78–81, 13 Sup. Ct. Rep. 254.

The condition of McLellan is analogous to that of a grantee in a later deed claiming as against the grantor in a prior unrecorded one, by virtue of the ordinary recording statute in which the rule is that it is incumbent upon him to prove payment of a valuable consideration at least. *Lake* v. *Hancock,* 38 Fla. 53–61, 56 Am. St. Rep. 159, 20 So. 811, and cases cited; *Bell* v. *Pleasant,* 145 Cal. 410–413, 104 Am. St. Rep. 61, 78 Pac. 957; *Watkins* v. *Edwards,* 23 Tex. 443.

The sole evidence of purchase in good faith for a valuable consideration is found in the deposition of McLellan. He testified that he was a member of the firm of Boody, McLellan, & Company, bankers and brokers in the city of New York. Had known Clark on the street for years, but had never exchanged visits socially. Clark had never done him a favor, nor had he ever lent Clark money. There had been no previous business transactions between them. When asked how well he knew Clark he said: "I have known his reputation as a very eminently excellent man." As near as he could remember, Bayliss Clark, a son of Francis B., came to him in May, 1905, saying that his father was in a somewhat straitened way for money and had this claim against the McKay estate, which he would sell at somewhat of a discount. The claim was for $7,410, and he would take $7,000 for it. Witness took the assignment and gave a check to Clark for $7,000. This check was produced. It bears date May 23, 1905, is on the Manhattan Bank, and signed by Boody, McLellan, & Company. The indorsements show that it was indorsed by Clark to the Mount Morris bank, and paid to the latter through the clearing house on the same day. The amount of the check was

charged to the private account of witness with his firm. Witness had no other evidence than Clark's word for his ownership, the allowance of the claim against the estate, or the solvency of the estate. He made no inquiries of anyone, and had no suspicion regarding Clark's absolute ownership. The assignment delivered to him by Clark bears date May 18, 1905. It recited the compromise with the McKay estate, for $12,500, of a claim held by Clark in his own right and as assignee; that $3,090 had been paid on it by the assignment of a mortgage that had been given by his assignor, and $2,000 to his attorney, Emilie M. Bullowa, and associates, leaving a balance of $7,410. The formal assignment upon an expressed consideration of $7,000 follows these recitals. Witness had known McKay well in Boston during "the 50's" and believed him to be a rich man. Had not seen him since 1859 or 1860, and did not know what business he had been engaged in for the last twenty years. Had no correspondence and no relations with him. He said he would have as soon made inquiries about J. P. Morgan or John D. Rockefeller. It is difficult to believe that an ordinary banker and broker would pay so large a sum for a claim against an estate administered in another jurisdiction, without making some inquiry into the validity of the alleged allowance of the claim and the solvency of the estate, especially when he had no intimate acquaintance with the assignor, was under no obligations to him, and only knew that he was reputed to be a "very eminently excellent man." Such a transaction is not in accord with common experience and observation.

The witness substantially confessed this in an answer to a question on cross-examination, saying: "Well, perhaps, as a strictly business proposition it might not, without the consideration of the confidence I had in the claim against the estate, and in the desire to fulfil this wish, you know, of Mr. Clark's. Aside from that, perhaps, it might be considered as not a strictly business transaction. I desired to help Mr. Clark, and I let him have the money and bought the claim." As we have seen, no reason was given for wanting to help Clark.

It seems somewhat strange, also, that no other evidence.

was introduced to corroborate this testimony, in some particular, at least. In weighing testimony, courts are not bound to believe a fact or facts testified to, especially by an interested witness, because he may not have been directly contradicted or impeached. "The inherent probability or improbability of such a fact is to be tested by the unquestioned circumstances that surround the main transaction or occurrence, as well as by 'the ordinary laws that govern human conduct.'" *Beals v. Finkenbiner,* 12 App. D. C. 23–29. Fraud, especially under the conditions of a case like this, can rarely be proved save by circumstances. While the circumstances attending the transaction throw great doubt upon the [good] faith of McLellan, we would probably not be justified in rejecting his testimony as incredible. But there is another circumstance elicited in the cross-examination of McLellan, which resolves the doubt against him, and warrants the conclusion that there is collusion between him and the fraudulent assignor. It will be remembered that Miss Bullowa was Clark's leading counsel in the prosecution of the claim against the McKay estate. Her name is so recited in the assignment under which McLellan holds. He states he had never seen Miss Bullowa until the morning on which he testified, but confessed that she had been his attorney "since some time after bringing this suit." He testified on January 7, 1909, and the suit had been filed on October 18, 1905. Both witness and said attorney lived in the city of New York. Notwithstanding the recital in his assignment, witness said he did not know that Miss Bullowa had been Clark's attorney. Nor did he attempt to explain how, when, or why he had retained her for the defense of the suit. We are convinced that McLellan is not a bona fide holder of this allowed claim against the estate of McKay, and must therefore reverse the decree in his favor. The decree is reversed, with costs, and the cause remanded, with directions to enter a decree for complainant in conformity with this opinion.

*Reversed.*

A motion by the appellee for a reargument was overruled February 2, 1910.