## POSTAL TELEGRAPH-CABLE CO. v. CITIZENS' NAT. BANK.

### (Circuit Court of Appeals, Third Circuit. January 11, 1916.)

### No. 2028.

1. BILLS AND NOTES ⬅149—NEGOTIABLE INSTRUMENTS—NATURE AND FORM—"COMMERCIAL PAPER."

A telegraph company which transmitted money by telegraph, for its convenience, would issue to the sendee of money so transmitted a draft drawn on its money transfer department, and directing payment to the order of such sendee of the sum therein named, reciting that this was the sum placed to his credit by the sender, and that the receipt thereof on the conditions under which it had been transmitted was acknowledged by indorsement thereon. The drafts directed that the amount be charged to the account of money transfers, and bore a statement that it would be cashed by a named bank. *Held*, that these drafts were "commercial paper" within the Negotiable Instruments Act of New Jersey (P. L. 1902, p. 583), and were governed by the rules applicable to that class of instruments.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 296, 373; Dec. Dig. ⬅149.

For other definitions, see Words and Phrases, First and Second Series, Commercial Paper.]

2. BILLS AND NOTES ⬅345—BONA FIDE HOLDERS—"NOTICE."

Negotiable Instruments Act N. J. (P. L. 1902, p. 593) § 56, provides that to constitute notice of an infirmity in an instrument or a defect in the title of the person negotiating it, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith. A clerk in the money transfer department of a telegraph company obtained blank forms of drafts issued by its agents to the sendees of money transferred by telegraph, forged the signature of an agent thereto, and the indorsement thereon of the apparent payee, and deposited them in a bank in the small town of N., where he lived. He had resided there for some years, was only 20 years old, of slender means, and living on his salary, and N. was not the place where the drafts were drawn or were to be paid, or where the payee resided. The bank knew some of these facts, but it further appeared that its teller asked such clerk what he was doing with the money, and was told that he was acting as paymaster and forwarding the money to meet the pay roll of a man who was extending the line, that the teller suggested calling up the company, and the clerk acquiesced, but that this inquiry was not made, and that though the forgeries extended over several months, the drafts were paid by the company without objection. *Held*, that under section 56 the mere fact that the circumstances were suspicious did not put the bank upon "notice" and charge it with the duty of inquiry; the jury having found that it did not act in bad faith.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 849–852; Dec. Dig. ⬅345.

For other definitions, see Words and Phrases, First and Second Series, Notice.]

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. BILLS AND NOTES ☞377—RIGHTS OF BONA FIDE HOLDERS.

    Where a bank took title to forged drafts in good faith and they were subsequently paid by the drawee, it had a right to retain the proceeds.

    [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 952; Dec. Dig. ☞377.]

4. APPEAL AND ERROR ☞690—RESERVATION OF GROUNDS OF REVIEW—EXCLUSION OF EVIDENCE.

    In an action against a bank, the exclusion of a question as to what the bank's cashier told the witness about a matter in controversy would not be reviewed, where there was no statement of what the witness was expected to prove, and it did not appear what the answer would have been, or whether it would have been favorable to the party asking the question.

    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2897–2899, 2902–2904, 2906, 2908; Dec. Dig. ☞690.]

In Error to the District Court of the United States for the District of New Jersey; Thos. G. Haight, Judge.

Action by the Postal Telegraph-Cable Company against the Citizens' National Bank. Judgment for defendant, and plaintiff brings error. Affirmed.

Vredenburgh, Wall & Carey, of Jersey City, N. J. (John A. Hartpence, of Jersey City, N. J., of counsel), for plaintiff in error.

Harrison P. Lindabury, of Newark, N. J., and Elmer King, of Morristown, N. J., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. During the first nine months of 1910 a trusted clerk in the New York office of the Postal Telegraph Company defrauded it of $3,722 in 17 installments differing in amount. He lived in Netcong, N. J., and deposited the money obtained by the fraud in the Citizens' National Bank of that village, checking it out from time to time and applying it to his own use. The bank was sued on the theory that the circumstances of the various transactions unmistakably indicated their fraudulent character, and called for diligent inquiry into the genuineness of certain forged drafts by which the unlawful scheme was carried out. The case was submitted to the jury, and a verdict was found in favor of the bank. In order that the principal questions presented to us may be properly understood, the facts should be stated in somewhat fuller detail.

Among the local offices of the company throughout the United States, there are more than 300 from and to which the public may send money by telegraph. During the period in question the following method of transmission was followed: The sender, say, at Pittsburgh, Pa., signed a written application, requesting the company to pay a specified sum of money to a designated person at, say, Petersburg, Va., and deposited the money with the Pittsburgh agent. Thereupon the Pittsburgh agent, using a private code, telegraphed these facts to the Petersburg agent, and the latter notified the person designated as payee. When the payee appeared, the Petersburg agent gave him a draft on New York City for the sum named, signing the draft and making it payable to the

order of the payee. The draft was drawn on the company's money transfer department at 253 Broadway, and would be cashed by any bank in Petersburg or elsewhere, after the usual identification of the holder. The cashing bank forwarded the draft for collection to its correspondent in New York, who received payment on presentation to the money transfer department, payment being made by the company's check on the American Exchange National Bank; the correspondent of course reimbursing the local bank by whom the draft had been forwarded. The money to meet the draft was sent to New York by the Pittsburgh agent, accompanied by a remittance slip, stating the amount, the names of the sender and the payee, the day when the money was deposited, and the names of the sending and the receiving offices. If (as often happened) the money did not reach New York before the draft, the company paid the draft nevertheless out of a fund maintained in bank for this purpose.

During the period in question and for a good while before, the clerk in question was employed in the money transfer department, and was familiar with the system referred to. Evidence was offered to prove—and there is no reason to doubt—that he obtained some of the blank drafts on the money transfer department, and forged 17 of them, aggregating $3,722 so as to simulate genuine drafts from Petersburg, signing the name of V. H. Borst, the company's agent at that place, making the drafts payable to one James Gouvas, and forging his name also as indorser thereon, and thereupon presenting them to the bank at Netcong for deposit to his own credit. His duties in the office at New York were of such a nature that he was able to make misleading entries and do other acts that covered up his thefts until they were brought to light by accident.

The form of the drafts is as follows:

3237
(Office)                                    (Date)
............................................................ 190:.  $.............
Pay to the order of .......................................................
.......................................................... dollars ............
being the sum placed to his credit by ....................................
.......................................... at .............................
receipt of which, on the conditions under which the same has been transmitted, is acknowledged by indorsement hereon and charge same to account of money transfers.
To the Gen'l Agent Money Transfer Dep't,
          Postal Telegraph-Cable Co.,
                253 Broadway, New York.
No. ........    Time paid ............

                                        ........................
                                        Money Transfer Agent
Form 106—Special                               D 759
          This draft will be cashed by
................................................. Bank
at ...................................................................
                Upon Identification of the Payee.
Identified by
.........................................................................

When filled out, each draft purported to recite the transfer of money from Pittsburgh to James Gouvas at Petersburg, and each purported

to be drawn on the money transfer department in New York by Borst, the agent at Petersburg, to the order of Gouvas, and to be indorsed by Gouvas, and also by the clerk in question. On each draft the company's name was prominently printed, and the money transfer department was directed to charge the amount thereof to the account of money transfers. Accepting spurious drafts of the character described, the company paid the following sums on the days mentioned:

| | | | |
|---|---|---|---|
| March 7th, 1910 | | | $112.00 |
| " 23d, | " | | 250.00 |
| " " | " | | 258.00 |
| " 24th, | " | | 125.00 |
| " " | " | | 212.00 |
| " 29th, | " | | 100.00 |
| May 21st, | " | | 150.00 |
| June 14th, | " | | 175.00 |
| July 2d, | " | | 280.00 |
| " 26th, | " | | 250.00 |
| " 27th, | " | | 210.00 |
| July 30th, | " | | 475.00 |
| Aug. 1st, | " | | 350.00 |
| Aug. 5th, | " | | 150.00 |
| " 12th, | " | | 250.00 |
| " 27th, | " | | 250.00 |
| Sept. 6th, | " | | 125.00 |
| | | | $3,722.00 |

These drafts were credited to the clerk by the Netcong bank, and were then forwarded for collection to the Chase National Bank of New York City to whom they were paid by the company's checks.

The company contends that on the dates specified the Netcong bank knew, or should have known, numerous facts about the clerk—his youth (about 20 years); his financial resources; mode of living; environment, habits, and character; that he had resided for years in Netcong (a small town of perhaps 2,000 inhabitants); that he was, and for a long time had been, employed by the Postal Company; that he was a young man of slender means, living on his salary; and that Netcong was not the place where the drafts were drawn, or were to be paid, or the place where the payee resided, and therefore was not the natural place for cashing such drafts. In a word, the argument is that the surrounding circumstances clearly suggested that the clerk had fraudulently issued the drafts, and was using them fraudulently, and that he had forged the signatures of Borst and of Gouvas, thus putting the bank on notice, and charging it with the duty of diligent and careful inquiry and effort to ascertain whether the drafts and the signatures thereon were in fact genuine, and whether the clerk was in reality entitled to receive the money. Denying the exercise of such care and diligence, the company charges the bank with having cashed the drafts and credited the clerk with the proceeds, wrongfully and not in good faith or in due course of business, but carelessly, and recklessly, the circumstances being such as to visit the bank with notice that the drafts were fraudulent.

[1] 1. The company takes the position—but does not maintain it with much earnestness—that the drafts in question are not commercial paper, and should not be governed by the rules applicable to that class

of instruments. No reason was offered to support the position, except that the drafts were drawn for the company's convenience, and this does not seem to need any other reply than a mere reference to the early sections of the New Jersey Negotiable Instruments' Act (Laws of 1902, page 583), which clearly include such instruments as these in their description of commercial paper.

[2, 3] 2. Being commercial paper, therefore, section 56 of the act furnishes the rule by which the conduct of the bank is primarily to be judged:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

The bank did not have actual knowledge of the defect in the clerk's title, but there was evidence in the case to justify the inference that it knew some (but not all) of the facts contended for by the company. Qualifying these, however, there was evidence that in May or June the teller asked the clerk what he was doing with the money, and was told that he was acting as paymaster, and was forwarding the money to meet the pay roll of a man in West Virginia, who was extending the line. When the teller suggested calling up the company to inquire if everything was right, the clerk acquiesced; but it does not appear that any inquiry was made. And it was also proved that the company made no objection to any of the drafts until the fraud was discovered early in October. Now, whether or not it was proper to permit the jury to draw an inference of the bank's bad faith from the whole of this evidence, the fact remains that the question of bad faith *was* submitted to the jury, and has been found against the company. The objection made on this writ of error is, in effect, that the jury should have been told that if the circumstances were suspicious, the bank was put upon notice and was charged with the duty of inquiry. It is scarcely necessary to say that this is not the prevailing rule. Section 56 distinctly provides to the contrary, and this is in harmony with the modern view. Goodman v. Simonds, 20 How. 343, 15 L. Ed. 934; King v. Doane, 139 U. S. 173, 11 Sup. Ct. 465, 35 L. Ed. 84; Swift v. Smith, 102 U. S. 444, 26 L. Ed. 193; Mee v. Carlson, 22 S. D. 365, 117 N. W. 1033, 29 L. R. A. (N. S.) 388; 7 Cyc. 943, VII, b, et seq. Moreover, the question was also submitted whether the company took the proper precautions to ascertain whether the signatures purporting to be the signatures of its agents had been forged, the jury being instructed that the company had a reasonable time to discover the forgery and to repudiate it. Naturally the company does not assign these instructions for error, and we refer to them to show (what indeed the charge expressly states) that the trial judge had in mind the unusual situation—a drawee accepting and paying a forged draft to a bona fide holder—and correctly applied the rules laid down in the leading case of Bank of U. S. v. Bank of Georgia, 10 Wheat. 333, 6 L. Ed. 334, and other decisions. Under the doctrine of that case, if the Netcong bank took title to the drafts in good faith, it had a right to retain the proceeds.

[4] 3. The next question raised is the correctness of a ruling on evidence. The company's vice president being on the stand, and having testified that in December, 1910, he talked with the cashier in Netcong about these drafts, was asked by the company's counsel what the cashier then said to him with regard to what had taken place when the drafts went through the bank. Upon objection, the court refused to permit the witness to answer, and this refusal is assigned for error. As we do not know what the answer would have been, we see nothing to review. The answer might, or might not, have been favorable to the company. Suppose the witness had answered that he did not remember, or that the cashier said nothing on the subject; manifestly the answer would not have helped the company, and its exclusion would be unimportant. And, as there was no statement of what the witness was expected to prove, we are in no position to judge whether the conversation was properly excluded, or ought to have been heard. The assignment has been argued on the theory that the answer (if competent) would have helped the company; but there is nothing on the record to support the position, and we shall not base a ruling on a guess.

The case was well tried, and the judgment is now affirmed.