IVAN LINK, Appellant v. J. W. JACKSON et al., Respondents.

Springfield Court of Appeals, June 12, 1911.

1. **BILLS AND NOTES: Fraud: Holder in Due Course: Burden of Proof.** In an action on a note the defense was that the note had been obtained through fraud and the evidence showed that one W, to whom the note had been given, had come to defendant's neighborhood to sell shares in a stallion and had previously obtained from several prominent business men their personal checks, each for an amount equivalent to the price of one share of stock in said horse; but these checks had been obtained with the understanding that they would be returned to the makers and were to be used to induce others to take stock in the horse. Defendants were shown these checks by W, who falsely stated to defendant that the makers of said checks had purchased shares in said horse and had given said checks in payment therefor, which representations induced plaintiff to buy one share and execute his note in payment therefor. It appeared to be conceded that the evidence was sufficient to

show that the note was obtained through fraud and it was *held* that the burden was cast upon the plaintiff, who claimed to be an innocent purchaser of the note, to show that he bought without knowledge of said fraud.

2. ———: ———: ———: **Knowledge That Will Defeat Title of Purchaser: Bad Faith.** Since the case of Hamilton v. Marks, 63 Mo. 167, down to and including the new negotiable instrument law, the rule has been that suspicion on the part of the taker of negotiable paper, of defective title in the prior holder, or knowledge on his part of circumstances which would excite suspicion thereof in the mind of a prudent man, or negligence on the part of such taker at the time of the transfer will not defeat his title. Such holder's rights cannot be defeated without proof of actual notice or knowledge of a defect in the title or bad faith on his part evidenced by circumstances.

3. ———: ———: ———: ———: ———. Under the Negotiable Instrument Law (R. S. 1909, sec. 1026), the notice to a purchaser of a negotiable instrument, of a defect in the title of the person negotiating the same, means actual knowledge as distinguished from implied or constructive notice, which arises when a person is put on inquiry and his knowledge is presumed. If it can be collected by a jury from circumstances fairly warranting such inference that the purchaser knew or believed or thought the bill or note was tainted with illegality or fraud such a general or implied notice will amount to bad faith and will destroy the title.

4. ———: ———: ———: ———. Gross negligence on the part of the purchaser of a negotiable instrument may be evidence of bad faith, but it is not the same thing. While he is not obliged to make inquiries, the purchaser must not shut his eyes to the means of knowledge which he knows are at hand, for the reason that such conduct, whether equivalent to notice or not, would be plenary evidence of bad faith.

5. ———: ———: ———: **Burden of Proof: Instructions.** In a suit on a promissory note where the defense is that the note was procured by fraud, the law casts the burden on the plaintiff of showing that he was the purchaser of said note in good faith and an instruction which by implication casts the burden of proof on the defendants to establish plaintiff's bad faith was properly refused.

6. **EVIDENCE: Burden of Proof: Burden of Evidence.** There is a distinction between the "burden of proof" and the "burden of evidence." The former is the burden of producing a preponderance of evidence, while the latter means the burden that rests upon the party to meet a prima facie case. The latter shifts from side to side in the progress of the trial but the former does

not change and remains on the party maintaining the affirmative of the issue involved.

7. **BILLS AND NOTES: Fraud: Holder in Due Course: Burden of Proof.** The Negotiable Instrument Law, section 1029, Revised Statutes 1909, which casts the burden on the plaintiff of proving that he is a holder in due course when it is shown that the note was obtained through fraud, uses the term "burden of proof" in the strict sense and not in the sense of "burden of evidence."

8. ————: **Fraud: Holder in Due Course: Knowledge of Fraud.** In an action on a promissory note where the defense is that the note was procured through fraud and plaintiff claims to be an innocent purchaser, in order to charge plaintiff with actual knowledge constituting bad faith, it is not necessary that he should have specific knowledge of the infirmity in the note.

9. **EVIDENCE: Presumption of Honesty: Burden of Proof: Bills and Notes.** While it is true that the law generally presumes honesty and not dishonesty, yet in an action on a negotiable instrument where it has been shown that the instrument was obtained through fraud, the burden is cast upon the plaintiff who claims to be an innocent purchaser to show that he acquired the title as a holder in due course for the reason that the facts and circumstances surrounding the purchase of the note are matters peculiarly within his own knowledge.

10. **BURDEN OF PROOF: Prima Facie Case: Oral Testimony: Question for Jury.** When the allegations of the plaintiff's petition are denied by answer and the plaintiff has the burden of proof and the evidence introduced by plaintiff to sustain the issues on his part is oral and by it plaintiff has made a prima facie case, the defendant is nevertheless entitled to have the issue of fact submitted to the jury, though the plaintiff's evidence may be uncontradicted and unimpeached, and even though defendant introduces no evidence; because uncontradicted testimony cannot be treated as conceded facts. The jury and not the court must determine the credibility of the witnesses and the weight to be given to their testimony.

11. ————: ————: ————: ————: **New Trial.** Where the allegations of plaintiff's petition are denied by answer and plaintiff has made out a prima facie case by oral testimony and defendant offers no evidence at all, the court cannot direct a verdict for the plaintiff, but defendant has a right to go to the jury. The power of the trial court in such cases, where the verdict is not supported by the evidence, is restricted under the statutes to the granting of one new trial.

12. INSTRUCTIONS: Failure to Define Terms: Duty to Request. In an action on a promissory note where the appellant uses the terms, "good faith" and "bad faith" in his instructions, and does not ask the court to define these terms, he cannot complain that the terms were used in respondent's instructions without a proper definition.

13. ————: Bills and Notes: Fraud: Including Issue Not Covered by Evidence. In an action on a promissory note where the defense was that the note was procured by fraud and the only evidence in any way tending to impeach the good faith of the defendant in purchasing the note was facts and circumstances offered to show that he purchased the same with actual knowledge of the original fraud, an instruction was *held* erroneous which in addition to directing the jury to find for the defendant in case they find that the plaintiff at the time he purchased the note had actual knowledge of such fraud, included also a clause, "or had knowledge of such facts that his action in taking such notes amounted to bad faith."

Appeal from Texas Circuit Court.—*Hon. L. B. Woodside,* Judge.

REVERSED AND REMANDED.

*Lamar, Lamar & Lamar* for appellant.

It has been held repeatedly that knowledge of facts and circumstances which would put a prudent man on inquiry is not sufficient, nor is mere suspicion that the note was obtained by fraud, nor is the proof of negligence on his part sufficient to defeat recovery. 7 Cyc. 944; Hamilton v. Marks, 63 Mo. 167; Dickey v. Adler, 143 Mo. App. 332; Reeves v. Letts, 143 Mo. App. 196; Hayes v. Blaker, 138 Mo. App. 24; Bank v. Rominee, 138 Mo. App. 57; Bank v. Leeper, 121 Mo. App. 695; Bank v. Hammond, 104 Mo. App. 403; Jennings v. Todd, 118 Mo. 305. (2) The Missouri rule that the purchaser of commercial paper before maturity for value is under no obligation to inquire for knowledge concerning the facts of its origin or to follow up circumstances of which he has knowledge which might excite the suspicion of a prudent man, is also the rule in other states and the rule of the Supreme Court of

the United States. Bank v. Butler, 83 S. W. 655; Cheever v. Railroad, 150 N. Y. 50, 55 Am. St. Rep. 646; Bank v. Morgan, 44 Am. St. Rep. 654; Kitchen v. Laudenback, 48 Ohio 177, 29 Am. St. Rep. 544; Swift v. Smith, 102 U. S. 442, 26 Law Ed. 193. (3) If the defendants made a prima facie case, then when the plaintiff showed that he bought the notes before maturity for value, the burden shifted to the defendants to show notice on the part of the plaintiff. Reeves v. Letts, 143 Mo. App. 199; Hayes v. Blaker, 138 Mo. App. 29; Bank v. Leeper, 121 Mo. App. 694; Bank v. Skeen, 101 Mo. 689; Davis v. Bartlett, 112 Ohio St. 534, 80 Am. Dec. 379; Beden v. Herring, 11 Am. St Rep. 326; Bank v. Burgwyn, 110 N. C. 267, 14 S. E. 263; Henry v. Buddecke, 81 Mo. App. 360. (4) In instructions No. 1, 2 and 3 given for the defendants, the court left it to the jury what would constitute fraud, or a failure of consideration. This was error. Technical terms should be defined. Bowles Commission Co. v. Hunter, 91 Mo. 337; Dry Goods Co. v. Schooley, 66 Mo. App. 415; Flint Mfg. Co. v. Ball, 43 Mo. App. 510; Ins. Co. v. Digby, 3 Mo. App. 603; Clark v. Kitchen, 52 Mo. 316; Speak v. Dry Goods Co., 22 Mo. App. 122; Boogher v. Neece, 75 Mo. 386; Mason v. Stock Yards Co., 60 Mo. App. 100; Jordan v. Moulding Co., 72 Mo. App. 325; Gebhardt v. Transit Co., 97 Mo. App. 381; Magraine v. Railroad, 183 Mo. 132; Mulderg v. Railroad, 116 Mo. App. 672. (5) The court erred in refusing to give instruction No. 4 asked by plaintiff and refused. While it is not the duty of the court to weigh the evidence, yet it is the duty of the court to pass upon whether or not there is any substantial testimony to support a verdict. In this case there was no substantial evidence, either direct or circumstantial, to show knowledge on the part of the plaintiff and instruction No. 2, asked by the plaintiff, withdrawing this question from the jury should have been given. Board of Commissioners v. Clark,

94 U. S. 278, 24 Law Ed. 59; Pleasants v. Fant, 89
U. S. 116, 22 Law Ed. 781; Implement Co. v. Munson,
81 U. S. 442, 20 Law Ed. 867; Landis v. Hamilton, 77
Mo. 554; Powell v. Railroad, 76 Mo. 84; Jackson v.
Hardin, 83 Mo. 186.

*Dooley, Hiett & Millard* and *W. E. Barton* for re-
spondents.

(1) If a note in the first instance was in the
hands of a fraudulent holder, then it is presumed to be
in the hands of such a holder of that character until
the contrary is proved, and the burden is on the trans-
feree to prove by the greater weight of the evidence
that he or some person under whom he claims took the
note before it was overdue; that he took it in good
faith, and for value; that at the time it was negotiated
to him he had no notice of any infirmity in the note
or defect in the title of the person negotiating it to
him and that he took it in due course of business.
Parson v. Cement Co., 82 Conn. 333, 73 Atl. Rep. 789;
Jobes v. Wilson, 140 Mo. App. 292, 135 Amer. St. Rep.
278; Bank v. Hanks, 142 Mo. App. 110; Bank v. Mills,
143 Mo. App. 265; Bank v. Tuttle, 144 Mo. App. 294;
Hill v. Dillon, 131 S. W. 730; Jones v. Bank, 144 Mo.
App. 428; Bank v. Hammond, 124 Mo. App. 180; Mc-
Knight v. Parsons, 22 L. R. A. (N. S.) 718; Joy v.
Diefendorf, 27 Amer. St. Rep. 484.   (2)   Testimony
was introduced by the defendant tending to prove that
one A. H. Willard procured the note in question from
the defendant Jackson by fraud. It was for the jury
to say whether this testimony was true or not true.
If the jury believed this testimony to be true, then the
burden was cast upon the plaintiff as the transferee
of the said Willard to prove that he was a holder
of said note in due course and it was the province of
the jury and not the court to determine from the evi-
dence whether or not plaintiff had discharged the bur-
den.   Jobes v. Wilson, 140 Mo. App. 292; Bank v.

Mills, 143 Mo. App. 269; Gregory v. Chambers, 78 Mo. 298; Wolf v. Campbell, 110 Mo. 120; Gordon v. Burris, 141 Mo. 614; Dawson v. Wembles, 111 Mo. App. 540; Chinn v. Railroad, 100 Mo. App. 576; Hugumin v. Hinds, 97 Mo. App. 352; Millikin v. Commission Co., 202 Mo. 655; Dalton v. Poplar Bluff, 173 Mo. 47. (3) Had the plaintiff's testimony as to his being a purchaser in due course of the note in question been uncontradicted as claimed by counsel for the appellant, still it would have been the duty of the court to have submitted to the jury the question whether or not plaintiff was such a purchaser. It being for the jury to say whether or not they believed the witness, he being an interested party. Bank v. Hammond, 124 Mo. App 180; Wolf v. Campbell, 110. Mo. 114; Chinn v. Railroad, 100 Mo. App. 576; Hugumin v. Hinds, 97 Mo. App. 352; Dawson v. Wembles, 111 Mo. App. 540; Dalton v. Poplar Bluff, 173 Mo. 46; Millikin v. Commission Co., 202 Mo. 655; McKnight v. Parsons, 22 L. R. A. (N. S.) 722; Joy v. Diefendorf, 27 Amer. St. Rep. 484. (4) The court did not err in not defining the word "fraud" used in instructions number one and two given for the defendant. The word "fraud" is not a word having a technical meaning but is a word of daily use, and a jury of ordinary intelligence would have no difficulty in understanding its meaning. Christian v. Ins. Co., 143 Mo. 467; Kischman v. Scott, 166 Mo. 228; Feary v. O'Neil, 149 Mo. 475. (5) If the failure of the court to define the word "fraud" used in the defendant's instructions was error still plaintiff cannot complain for his own instruction number two and three exhibit the same fault. State ex rel. v. Fidelity Co., 94 Mo. App. 196; Gordon v. Park, 219 Mo. 612; Rourke v. Railroad, 221 Mo. 62; Campbell v. Tinker, 137 Mo. App. 444.

STATEMENT.—This is an action on a promissory note given to A. H. Willard and indorsed "without

recourse.'' The petition, in addition to the usual allegations, avers that plaintiff is a holder of the note in due course. The answer raises the issue of good faith and sets up fraud and failure of consideration. A trial resulted in a verdict and judgment for defendants, and plaintiff appealed.

The answer is in substance as follows:

''Defendants deny that before the maturity of said note the payee therein, A. H. Willard, for a valuable consideration sold, indorsed or delivered said note to the plaintiff herein who then or there in good faith became in due course the owner or holder of said note or entitled to receive the amount due thereon nor is plaintiff now the owner or holder of said note.

''Defendants further say that J. L. Harrison is an accommodation maker of said note and that he signed the same at the request and for the accommodation of J. W. Jackson, the principal therein.

''For further answer, defendants say that on the 12th day of December, 1907, there was a certain corporation known as the Standard Horse Company, engaged in the business of buying and selling stallions and horses under the laws of the State of Missouri and that its principal office and place of business was then and is now in the City of Springfield, Missouri; that one A. H. Willard was then and is now a stockholder in said corporation, a member of its board of directors, and also general manager. That on or about the 12th day of December, 1907, the said A. H. Willard came to the city of Cabool, in Texas county, Missouri, and represented to divers men of business, wealth and influence in that vicinity, that the Standard Horse Company, the aforesaid corporation, was the owner of a standard bred stallion named and known as 'Cambridge Boy;' that the said Standard Horse Company was desirous of selling the said horse to the farmers of Cabool and vicinity; that the Standard Horse Company, in order to negotiate the sale of said

horse to said farmers, needed the assistance of some men of business, wealth and influence in that neighborhood to assist it in selling said horse to said farmers and represented to them that the plan and scheme of said company to sell said horse was to sell shares or interest in the horse of the value of $200 each and of the number of 20; and offered if they, the aforesaid men of business, wealth and influence, would assist in making said sale and for the purpose of inducing the said farmers of Cabool and vicinity to buy said horse would pretend to buy shares in said horse, and would execute and deliver to the said A. H. Willard their checks for eight shares of said horse so that he, the said A. H. Willard, could have said checks to show to said farmers as proof and tell them that the aforesaid men of business, wealth and influence had bought and paid for eight shares of said horse, the said Standard Horse Company would return them their checks unpaid and give them 8 out of the 20 shares for which said horse should be sold, which proposition of the aforesaid A. H. Willard and the Standard Horse Company was accepted and they executed and delivered to the said A. H. Willard their divers and sundry checks for the aggregate sum of $1600.

"That the said A. H. Willard, after being armed with the pretended checks went out to interview the farmers and try to induce them to buy the remaining shares of said horse. That A. H. Willard afterwards called upon J. W. Jackson, the principal defendant herein, a farmer residing in the vicinity of Cabool, and represented to the said J. W. Jackson that the corporation aforesaid was the owner of a standard bred stallion named and known as 'Cambridge Boy' and that said corporation was desirous of selling said horse to the farmers of Cabool and vicinity for the price and sum of $4000 and that a plan had been adopted for the purchase of said horse and that the plan adopted was to sell interest or shares in said horse at $200

each to the number of 20 and that each party who purchased shares in. said horse should pay cash or make and deliver to the said A. H. Willard his note or notes for the same payable in one and two years after date thereof. That the said A. H. Willard knowingly and designedly for the purpose of inducing defendant, J. W. Jackson, to purchase a share in said horse, falsely and fraudulently stated to defendant, J. W. Jackson, that the aforesaid men of business, wealth and influence had purchased and paid for eight shares of said horse and exhibited to said defendant for his inspection as proof of said pretense, representation and statement, the checks of the aforesaid men purporting to be given for the payment of the 8 shares of said horse. That relying on said pretense, statements and representations of said A. H. Willard and believing the same to be true and being deceived thereby, was thereby induced to and did purchase one share of said horse for the price and sum of $200, and executed and delivered to the said A. H. Willard the note filed with the plaintiff's petition, for the same.

"That said pretense, representations and statements were made by the said A. H. Willard for the sole purpose of inducing the defendant to purchase a share in said horse; that in truth and in fact the said horse was not worth the sum of $4000; that said horse is absolutely worthless. That said checks given by said men of business, wealth and influence were given by them to the said Standard Horse Company to assist it in perpetrating a fraud on this defendant and others, and that their pretended checks were returned to them when the aforesaid purpose for which they were given had been accomplished.

"That as seen as defendant ascertained the facts he tendered his share in said horse back to the said A. H. Willard and the said Standard Horse Company; that A. H. Willard and plaintiff then and there refused

to accept such tender, and defendant now tenders in court his share in said horse.''

The plaintiff is a resident of Springfield, Missouri, and the defendant resides near Cabool, Missouri. The note in question was given as part of the purchase price of a stallion, but whether from the Standard Horse Company, or from A. H. Willard, its manager, individually, is not clearly shown. The plan was to sell twenty shares at $200 each, valuing the horse at $4000, and to let the purchasers through a committee make their choice from a large number of horses.

In the latter part of the year 1907, A. H. Willard, manager of the Standard Horse Company, of Springfield, and an associate and agent, one James, came to Cabool for the avowed purpose of executing this design. They first visited, separately, Messrs. Henry Parmenter, James McDowell, John Bauch, S. W. Grant, and Henry Stogsdill, men of business, wealth and influence of that community, and agreed to give each a share in said horse for assistance in making the sale, and arranged with these persons to give their checks for the amount which a share would amount to with the understanding that said checks would be returned; and they exhibited these checks to these defendants, and others, who gave their notes, and then Willard gave the checks back to the drawers. The nature of the assistance contracted for is variously described by the witnesses. Some say they were to pass on the notes, others that they were to tell who would be likely to buy, and yet others that they were to help place the horse. At any rate, each of these men gave a check for $184, the price of a share in the stock company, less the discount,—as he says, ''To show people I had bought a share;'' with the express understanding that these checks should not be collected but would be returned to the drawers.

.Armed with these indicia of the genuine sale of shares, Willard and his associate went to interview

the farmers of the neighborhood, and near the close of their labor visited defendant Jackson. Willard was not present at the first conversation, however, and James was introduced as a representative of the Springfield Standard Horse Company. He said the horse belonged to the Company and he could not sell unless he secured twenty men to take one share each at $200. He claimed the purchase would be for the good of the community, and that he had only one share for the defendant. As among those who had taken shares, he mentioned James McDowell, Henry Parmenter, S. W. Grant, Henry Stogsdill, and several farmers. Defendant declined to purchase and James went back to Cabool. Defendant testified: "In an hour or two Henry Parmenter called me up over the 'phone and asked me if I had taken an interest in the horse and I told him no. I asked him if he had and he said, 'Yes.' He said he believed it was a good thing and he said I had better take an interest."

In a day or two, Willard, appeared at defendant's farm and was also introduced as a representative of the Springfield Standard Horse Company. He said he wanted to get defendant to take an interest in the Company's horse, and had an additional inducement to offer; If defendant would raise two colts to the age of four months they would be taken in payment for a share in the horse. He said the horse was a sure foal getter, was cheap at $4000, and could not be sold for less. "He told me that Henry Parmenter, John Bauch, S. W. Grant, Henry Stogsdill, Jim McDowell, and others, had signed, and that the bankers with Henry Stogsdill, that is, Grant, Parmenter, McDowell and Bauch, had given their checks for shares in the horse, and he handed out three or four of these checks and showed them to me. As he was in the buggy and I was on the ground I couldn't read the checks from the fact that I cannot read without glasses, and he said they were checks that they had given

for the horse,—that is, for one-twentieth interest in the horse each.''

Shortly afterwards, defendant went to Cabool, and Henry Parmenter, cashier of the Bank of Cabool, again urged him to take a share. And he finally consented, and signed the note in suit, with the understanding it should be paid with two colts.

A committee consisting of Stogsdill and Harrison was selected to choose the horse. Willard and James then advised McDowell to see Stogsdill, ''and the horse they said for him to take he was to say so too.'' ''I don't think they claimed they would pay him anything extra for that; but he was working under their instructions all the time.''

When Stogsdill and Harrison arrived at Springfield, they were met by Willard and taken to the Springfield Standard Horse Company's stable and shown the horses,—''about 10 head.'' They were told they could have any they wanted except one. They selected a bay in the stalls and then returned to Cabool. Just why the bay horse was not delivered according to this selection does not appear, but another committee was sent to the Standard Horse Company's stable, and they choose ''Cambridge Boy,'' the horse finally delivered. When the final selection had been made, Harrison went to Springfield after the horse. He arrived about nine o'clock and found Willard in charge of the Company's barn. Willard had a key to plaintiff's (Link's) office, and Link and Willard went there and remained till midnight and then Harrison took charge of the horse.

As soon as defendant Jackson ascertained that the checks of several purchasers were returned to the makers, he, Patton and others went to Springfield, found Willard at the Company's barn and asked to be allowed to return the horse and get their notes. During the time these men were trying to adjust their difficulty, plaintiff Link was seen to pass through the

barn and have a secret conversation with the manager, Willard.  Evidence was introduced tending to prove an offer to return the horse to plaintiff which offer at his instance was rejected.  Defendant, with others, brought suit in the Greene County Circuit Court to procure the cancellation of these notes.

The evidence further discloses that the Standard Horse Company was organized as a corporation in the year 1906 with plaintiff (Link) as president and Willard as manager, and so far as the record shows, no successor in office to either has ever been selected. Plaintiff claims he "virtually" resigned in 1907, but at the trial in Greene county in the summer of 1909 he swore that he was president.  According to his statement, when he virtually resigned, he contracted to assist the Company in its business, and for this was given the privilege of breeding fifteen mares a year for five years.

Plaintiff's office and principal place of business was in the same block as the Company's barn and within about 130 feet of it and he was there every day and saw the horses.  He was an admirer of horses and knew all those owned by the Company; knew the horse in question, his color, and whence he came; saw him every day for about two months.  He had long been in the horse business, and not only knew every stallion keeper in Springfield, but his horses as well.

Plaintiff's evidence stands alone on the bona fide of the transfer of the notes.  He claims to have purchased the notes sixty or ninety days after they were dated, in good faith and without knowledge of any infirmity, paying therefor as follows:

| | |
|---|---|
| Note owed him by Willard, about ........ | $1250 |
| Open account due from Willard, about .... | 100 |
| Small spavined stallion, ................ | 550 |
| Cash to make up the face of notes, about | 300 |

$2200.

He made no investigation whatever, relied wholly upon the statement of Willard and the bankers' letters to the notes, and took them "without recourse."

After selling the horse and taking the notes of the defendant and others, Willard secured a letter from Parmenter, cashier of the Bank of Cabool, and a letter from McDowell, cashier of the Cabool National Bank, both of which letters contained the statement that the writer thereof had examined these notes, that they were perfectly good, and that the men signing them were some of the best farmers in the neighborhood, and that the only reason the banks would not discount them was that they were on too long time; and the letter of McDowell states that the notes were given for the purchase of a horse, and that the purchasers were not only satisfied but pleased with their purchase, and the letter of Parmenter states that "this paper is as good as any to be made in this county."

The evidence for plaintiff tended to show that the stallion for which the notes were given belonged to Willard individually to whom the notes were payable. Neither Willard nor James were witnesses at the trial.

At the close of all the evidence, the plaintiff requested and the court refused to give the following instructions:

"1. The court instructs the jury that the execution of the note sued on is admitted by the defendants and that the burden of proof is upon the defendants to establish that there was fraud or failure of consideration for said note and that the plaintiff at the time of purchasing said note had knowledge either of said fraud or of want of consideration of said note.

"2. The court instructs the jury that under the pleading and the evidence the execution of the note sued on is admitted by the defendants, and there is no evidence to authorize the jury in finding that the plain-

tiff, at the time he purchased said note, had knowledge of any fraud in the inception of said note or of any failure of consideration, and you will therefore find the issues for the plaintiff.

"3. The court instructs the jury that although the plaintiff may have known when he bought the note facts that would put a prudent man upon his inquiry and enable him by investigation to learn the truth, and although he may have known of facts and circumstances that would excite suspicion in the mind of a reasonable and prudent person that the note was tainted with fraud or that there was a failure of consideration, yet these facts are not sufficient to defeat a recovery by plaintiff. If the plaintiff bought the note before maturity, before you would be warranted in finding the issues for the defendant you must find that the plaintiff had actual knowledge either of the fraud or of the failure of consideration before you can find the issues for the defendants.

"4. The court instructs the jury that the evidence is not sufficient to authorize a finding that plaintiff had knowledge of any fraud in obtaining the note, or any failure in the consideration therefor, and you should find the issues for the plaintiff for the amount of the note sued for."

The court gave the following instructions for the plaintiff:

"1. The court instructs the jury that the note sued on is a negotiable promissory note and that the plaintiff is entitled to recovery if you believe from the evidence that plaintiff purchased said note before maturity in good faith, for value, without notice, all of which is presumed to be the case, unless the contrary is made to appear by the evidence.

"2. The court instructs the jury that the execution of said note is admitted and if the jury find from the evidence that the plaintiff purchased the said note before maturity, in good faith, for valuable considera-

tion, without knowledge of any fraud in the procuring of said note by Willard, the payee thereof, and without knowledge of the failure of consideration, then the issues should be found for the plaintiff.

"3. The court instructs the jury that although you may find from the evidence that Willard, the payee in the note, procured the same by fraudulent representations as defined by the court's instructions herein, or that consideration for said note wholly or partially failed; yet if you further find from the evidence that the plaintiff purchased said note for value, before maturity thereof and without knowledge of said fraud and failure of consideration, then you will find the issues for the plaintiff."

The court gave the following instructions for the defendant:

"1. The court instructs the jury that if you believe and find from the evidence that the note in suit was obtained by fraud on the part of A. H. Willard and his agents, then the burden is on the plaintiff and he must show by the greater weight of the evidence, that he bought such note in good faith, in due course of business, without notice of the fraud by which the said A. H. Willard obtained such note; and that if the plaintiff has not made such proof by the greater weight of the evidence, then your verdict should be for the defendant.

"2. The court instructs the jury that if you shall find and believe from the evidence in this case and the circumstances surrounding the execution and sale of the note sued upon, that they had been procured from the defendants through fraud, and that the plaintiff at the time he purchased the note, had actual knowledge of such fraud or had knowledge of such facts that his action, in taking such notes, amounted to bad faith, then you will find the issues for the defendant .

"3. The court instructs you that fraud is not presumed, but must be proven; but it is not necessary

to prove it by direct evidence; but it may be inferred from all the facts and circumstances surrounding the case.''

NIXON, P. J.—The evidence in this case was such that no denial is made by the plaintiff that the note was fraudulent in its inception and procured by a scheme pregnant with dishonesty and chicanery. But the issue is presented whether such original fraudulent taint was communicated to the purchaser, the plaintiff in this case, through actual knowledge or notice. Questions affecting commercial paper, involving the rights of parties claiming to be *bona fide* holders for value, are always of great importance and often fraught with difficulty, involving, as they do, a system of jurisprudence entering largely into the commercial transactions of the world.

The appellant assigns as error that the instructions given at the trial failed to properly present the law as to what knowledge should be brought home to the purchaser of negotiable paper, and that to defeat a holder of such paper purchased for value before maturity, actual knowledge should be shown. The rule as to what knowledge will charge the purchaser of negotiable paper with knowledge of equities existing between the original parties has undergone radical changes in this state. The old rule was that to let in equitable defenses, constructive notice was sufficient if a person was put on inquiry; that facts and circumstances which would naturally put a person of ordinary prudence in the same situation on inquiry, reasonably leading to a knowledge of the truth, would be sufficient for a court to infer and find such knowledge. [Hamilton v. Marks and Black, 52 Mo. 78.]  But in the year 1876, in the case of Hamilton v. Marks, 63 Mo. 167, the question of notice as applied to negotiable paper was brought under consideration on a second trial of the case, and Judge WARNER, speaking for

the Supreme Court, after an exhaustive examination, overruled the law of constructive notice previously declared by the same court in Hamilton v. Marks and Black, 52 Mo. 78, and declared the law of commercial paper in Missouri according to the modern rule and in conformity to the decisions of England, and of the Supreme Court of the United States in the case of Goodman v. Simonds, 20 How. 343, in substance, as follows: Suspicion, on the part of the taker of negotiable paper, of defective title in the prior holder, or knowledge on his part of circumstances which would excite suspicion thereof in the mind of a prudent man, or gross negligence on the part of such taker at the time of his transfer, will not defeat his title. That result can be produced only by bad faith on his part. The rule that a purchaser is not an innocent holder if there are circumstances connected with the transfer sufficient to put an ordinarily prudent man on inquiry, is uncertain and devoid of uniformity, and no longer the prevailing law of the state.

Section 10026, Revised Statutes 1909, of the negotiable instruments law, now adopted by many states, provides: "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." [See also, Secs. 9999, 10022, 10024, 10025, R. S. 1909.] These provisions simply put in statutory form the rule of the common law as previously interpreted by many state courts and which was first authoritavely announced as the law of this state in the case of Hamilton v. Marks, 63 Mo. 167. Under the rules as now adopted defining the duties and obligations of a party to whose negotiable paper is presented for discount, such party is not bound at his peril to be on the alert

for circumstances which might possibly excite the suspicion of a wary and prudent man. He does not owe the person who has set the paper afloat the duty of active inquiry to escape the imputation of bad faith. The rights of the holder by such purchase are to be determined by the simple test of honesty and good faith and not by a speculative issue as to his diligence or negligence. Such holder's rights can not be defeated without proof of actual notice or knowledge of defect in the title or bad faith on his part evidenced by circumstances. Though he may have been negligent in taking the paper, or omitted precautions which a prudent man would have taken and thereby been put on inquiry, nevertheless, unless he acted in bad faith, his title is unimpeached according to the well-settled doctrines in this state. [Hamilton v. Marks, 63 Mo. 167; Jennings v. Todd, 118 Mo. 296, 24 S. W. 140; Borgess Inv. Co. v. Vetto, 142 Mo. 560, 44 S. W. 754; Leavitt v. Taylor, 163 Mo. 158, 63 S. W. 385; Goodman v. Simonds, 20 How. 343; Atlas Nat. Bank v. Holm, 71 Fed. 489; King v. Doane, 139 U. S. 166.]

The word "notice," therefore, must be understood when used in this connection as being used in the sense of actual knowledge; and, indeed, this is one of its usual and appropriate significations. [Goodman v. Simonds, 20 How. 343.] The notice required by the negotiable instruments law means actual knowlede as distinguished from implied or constructive notice which arises when a person is put on inquiry and knowledge is presumed. If it can be collected by a jury from circumstances fairly warranting such an inference that plaintiff knew or believed or thought the bill or note was tainted with illegality or fraud, such a general or implied notice will equally destroy the title. [Henry v. Sneed, 99 Mo. 407, 12 S. W. 663.] According to many authorities, it is ordinarily to be expected that the purchaser will testify in his own behalf that he had no actual notice of the circumstances

attending the inception of the note, and the defendant will necessarily have to rely upon circumstances to impeach his title to the note. Hence, while the notice or knowledge of the purchaser in cases of fraud must be actual, it is not essential that the knowlede of plaintiff should be established by direct testimony, but, like any other fact, such knowledge may be established by circumstances and inferences. [Edwards v. Thomas, 66 Mo. 469; Brown v. Hoffelmeyer, 74 Mo. App. 385, 391; Hoffman v. Leibzarth (Iowa) 2 N. W. 516; Myers v. Bealer (Neb.) 46 N. W. 479; Sullivan v. Langley, 120 Mass. 437; Shirk v. Heible (Ind.) 59 N. E. 281; Peirson v. McNeal (Mich.) 100 N. W. 465; Auton v. Gruner, 90 Ill. 300; Johnson v. Way, 27 Ohio St. 380.]

While neither negligence, nor knowledge of suspicious circumstances, nor failure to inquire into the consideration, will in and of itself be bad faith, such facts when proven may be considered by a jury in arriving at the ultimate fact of good or bad faith of the plaintiff. It is not a question of negligence but of good or bad faith. Gross negligence may be evidence of bad faith, but it is not the same thing. [Goodman v. Harvey, 4 Adol. & E. 870.] "Everyone must conduct himself honestly in respect to antecedent parties, when he takes negotiable paper, in order to acquire a title which will shield him against prior equities. While he is not obliged to make inquiries, he must not willfully shut his eyes to the means of knowledge which he knows are at hand, for the reason that such conduct, whether equivalent to notice or not, would be plenary evidence of bad faith." [Goodman v. Simonds, supra; Atlas Nat. Bank v. Holm, 71 Fed. 489, and cases cited.]

Appellant assigns as error in this case that the trial court erred in failing to properly instruct the jury as to actual knowledge. The law undoubtedly is, as already stated, that to defeat recovery on commercial paper purchased for value before maturity, ac-

tual knowledge of the facts which impeach the validity of the paper must be shown. The ultimate fact to be shown is bad faith, which implies guilty knowledge or willful ignorance. The court gave the following instructions on this question:

"The court instructs the jury that if you shall find and believe from the evidence in this case and the circumstances surrounding the execution and sale of the note sued upon, that they had been procured from the defendant through fraud, and that the plaintiff at the time he purchased the note, had actual knowledge of such fraud or had knowledge of such facts that his action, in taking such notes, amounted to bad faith, then you will find the issues for the defendant."

"The court instructs the jury that the note sued on is a negotiable promissory note and that the plaintiff is entitled to recovery if you believe from the evidence that plaintiff purchased said note before maturity in good faith, for value, without notice, all of which is presumed to be the case, unless the contrary is made to appear by the evidence."

Plaintiff requested and the court refused to give the following instruction:

"The court instructs the jury that although the plaintiff may have known when he bought the note facts that would put a prudent man upon his inquiry and enable him by investigation to learn the truth, and although he may have known of facts and circumstances that would excite suspicion in the mind of a reasonable and prudent person that the note was tainted with fraud or that there was a failure of consideration, yet these facts are not sufficient to defeat a recovery by plaintiff. If the plaintiff bought the note before maturity, before you would be warranted in finding the issues for the defendant you must find that the plaintiff had actual knowledge either of the fraud or of the failure of consideration before you can find the issues for the defendants."

The failure to give the last instruction is a special ground for complaint. This instruction was properly refused on the ground that, by implication at least, it cast the burden of proof on the defendants to establish the plaintiff's bad faith when the law places on the plaintiff the burden of showing that he was a purchaser in good faith. We think plaintiff would be entitled to a proper instruction as to actual notice or knowledge to the effect that although the plaintiff may have known when he purchased the note facts and circumstances which would have put a prudent person upon inquiry and enabled him to investigate the truth, and although plaintiff may have known facts at the time of his purchase that would excite suspicions in the mind of a reasonably prudent person that the note was tainted with fraud, yet these facts are insufficient in and of themselves to defeat plaintiff's recovery, provided the plaintiff has shown by the greater weight of the testimony that at the time he purchased the note he had no actual notice or knowledge of its fraudulent inception, and provided further, that any notice or knowledge by defendant of such facts and circumstances, if any has been shown, may be taken into consideration with all the other facts and circumstances in evidence in determining the question as to whether the plaintiff had actual notice at the time of his purchase that the note was tainted with fraud.

The plaintiff further assigns as error that the court failed to properly instruct the jury as to the burden of proof, and he asserts with much earnestness that the true rule in cases like the present is that when the note has been shown to have had its inception in fraud, the burden shifts to the plaintiff to show a purchase for value before maturity in good faith, and when he introduced sufficient evidence to make a prima facie case as to these facts the burden again shifts to the defendant's to show plaintiff's actual notice of the existence of such facts as will warrant a

jury in finding that plaintiff took the note in bad faith.

Section 10029, Revised Statutes 1909, is, in part, as follows: "Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course."

The question is therefore raised as to what the term, "burden of proof," means as used in this section of the negotiable instruments law. Unfortunately, this term is used by judges and text-writers in two distinct senses, either as "burden of proof," correctly speaking, or as the "burden of evidence," and the failure to discriminate in which sense the term is applied in each case has been the cause of much confusion in legal literature. The "burden of proof" is the burden of producing a preponderance of evidence, while the "burden of evidence" means the burden that rests upon a party to meet a prima facie case. These burdens are often on the same party, but this is not necessarily or always the case; nor is it safe to infer because a party has the burden of meeting a prima facie case therefore he must have a preponderance of evidence. It may be sufficient for him to produce just enough evidence to counter-balance that produced against him by his adversary. [Scott v. Wood (Cal.), 22 Pac. 871; Atlas Nat. Bank v. Holm, supra.] Justice Bigelow of the Supreme Court of Massachusetts in the case of Bridge Corp. v. Butler, 3 Gray, 132, stated the distinction as follows: "The burden of proof and the weight of evidence are two very different things. The former remains on the party affirming a fact in support of his case, and does not change in any aspect of the cause; the latter shifts from side to side in the progress of a trial, according to the nature and strength of the proofs offered in support or denial of the main

fact to be established." The distinction was also well stated by Church, C. J., in Heinemann v. Heard, 62 N. Y. 455, in the following language: "During the progress of a trial, it often happens that a party gives evidence tending to establish his allegations,—sufficient, it may be, to establish it prima facie; and it is sometimes said the burden of proof is then shifted. All that is meant by this is that there is a necessity of evidence to answer the prima facie case, or it will prevail; but the burden of maintaining the affirmative of the issue involved in the action is upon the party alleging the fact which constitutes the issue, and this burden remains throughout the trial."

Under section 10029, Revised Sttatutes 1909, "burden of proof," as therein provided is used in the strict sense of "burden of proof," and not in the sense of "burden of evidence." [Hamilton v. Marks, 63 Mo. l. c. 100.] After the note has been shown to have had a fraudulent inception, the reason for requiring the plaintiff to prove his good faith is stated in the case of Hamilton v. Marks, 63 Mo. l. c. 180, to be "obviously salutary, for the presumption is natural that an instrument so issued would be quickly transferred to another, and unless he gave value, which could be easily proven if given, it would perpetrate great injustice and reward fraud, to permit him to recover. The reasoning by which the foregoing rule is supported is, I think, unanswerable, and commends itself for its manifest justice. Where an instrument is procured by fraud, or is affected with illegality, the payee would undoubtedly be eager to transfer it, so that suit would be brought in the name of another, in order to prevent any valid defense if possible. In such a case, it is justice to the defendant, and it is no hardship to the plaintiff, to require him to show, that in acquiring the note he acted honestly and in good faith, and that he gave value for it." The language of the statute— "every holder is deemed prima facie to be a holder

in due course"—imports that the possessor of the note is the proper owner and in lawful possession, and such possession of itself clothes the note with the presumption that the plaintiff became the owner of the note at its date in the usual course of business without any notice that would impeach his title. But when fraud in the procurement of the note is shown, the inquiry then becomes one of fact without any presumption, and is to be determined, like any other fact, by the preponderance of the evidence—unsupported by legal presumption one way or the other. "The reason the burden of proof is cast contrary to the rule of pleading, upon the indorsee, is, as we suppose, because, if he was a good-faith purchaser, he has peculiar, if not exclusive, knowledge of the fact, and to find evidence of the contrary, if true, would be difficult and often impossible for the defendant in the action." [Atlas Nat. Bank v. Holm, supra, l. c. 493.] Under these authorities, the defect or infirmity in the title of Willard, the original payee, having been shown, the burden of proof was on the plaintiff to show that he was a purchaser in due course without actual knowledge of the defective title of the note.

In this connection it is further contended by the appellant that when defendants made a prima facie case of fraud in the inception of the note and the plaintiff showed that he received the note before maturity in good faith and for a valuable consideration, that the burden shifted and it devolved upon the makers to prove that the plaintiff had actual notice of the specific facts which constituted the fraud, and that a failure to so instruct by the trial court impeaches its judgment and entitles the plaintiff to a new trial. Under the authorities already cited in this opinion, it is obvious that plaintiff is using the term "burden of proof" in the sense of "burden of evidence." Although the duty of making a prima facie case may shift from time to time, the burden of proof, correctly

understood—that is, the duty which rests upon the party who asserts the affirmative of an issue of establishing it by a preponderance of the evidence—never shifts in the progress of the trial but remains with him to the end. [5 Am. and Eng. Ency. Law, 30.] And the cases cited by appellant in support of his contention as to the shifting of the burden will on examination be found to refer to the burden of evidence and not the burden of proof. As we have stated, section 10029, Revised Statutes 1909, refers to the burden of proof; and when the note is shown to have had its origin in fraud, the plaintiff must affirmatively show his good faith by a preponderance or greater weight of the evidence introduced in the case bearing on that question, whether such evidence is introduced by the plaintiff or the defendant. [J. D. Marshall Livery Co. v. McKelvy, 55 Mo. App. 240; Bunker v. Hibler, 49 Mo. App. 536; Long v. Long, 44 Mo. 141; 16 Cyc. 926; Heinemann v. Heard, 62 N. Y. 455; Hamilton v. Marks, 63 Mo. 167.] Nor is the contention of the plaintiff maintainable that in order to charge the holder with actual knowledge constituting bad faith it is necessary that the plaintiff should have specific knowledge of the infirmity in the note. [Wright Inv. Co. v. Fillingham, 85 Mo. App. l. c. 542; Studebaker Mfg. Co. v. Dickson, 70 Mo. 272; Whaley v. Neill, 44 Mo. App. 316; Brown v. Hoffelmeyer, 74 Mo. App. 385; Henry v. Sneed, 99 Mo. 423, 12 S. W. 663.]

Plaintiff cites authorities to the effect that the law presumes honesty and not dishonesty, good faith and not bad faith, and argues that by casting the burden of proof of good faith on the plaintiff he is required to prove his honesty and good faith contrary to the presumption generally prevailing. While it is true that the law generally presumes honesty and not dishonesty, good faith and not bad faith, and that to hold otherwise would seemingly require the plaintiff to prove a negative, contrary to the usual rules of law,

yet, in cases like the one under consideration, the burden is cast upon the plaintiff for the reason, heretofore stated, that he has peculiarly within his knowledge the circumstances surrounding the purchase of the note and what notice or knowledge he had at the time of its purchase as to its fraudulent origin. The objection of appellant that he is required to prove a negative in such case is not well taken. When the proof of fraud in the inception of the note is made, proof of his purchase without actual notice or knowledge becomes an essential fact of plaintiff's case, and when the plaintiff's affirmative case requires proof of a negative fact or facts, he must carry that burden. [State to use v. Cchar, 50 Mo. l. c. 394.] This is especially true in cases like the present where the facts concerning notice or knowledge are peculiarly within the breast of the plaintiff. [Winhart v. Railway Co., 207 Mo. l. c. 434, 105 S. W. 1043.]

Plaintiff further assigns as error the failure of the court to give the following instruction:

"The court instructs the jury that under the pleading and the evidence the execution of the note sued on is admitted by the defendants, and there is no evidence to authorize the jury in finding that the plaintiff, at the time he purchased said note, had knowledge of any fraud in the inception of said note or of any failure of consideration, and you will therefore find the issues for the plaintiff."

The basis of this claim is the plaintiff's testimony as to his good faith was unimpeached and uncontradicted and in no wise discredited, and that the jury and trial court arbitrarily and capriciously disregarded the same and that he was consequently entitled to a directed verdict.

There is a distinction between a demurrer to the plaintiff's evidence and a directed verdict by the court in plaintiff's favor. In order to sustain a demurrer to plaintiff's evidence for failure to make out a prima

facie case it is not necessary for the court to pass on
the credibility of plaintiff's witnesses; their credi-
bility is not only assumed, but the probative facts are
given every reasonable intendment in order to ascer-
tain the plaintiff's right of recovery. But a verdict for
the plaintiff, peremptorily directed by the court upon
evidence mainly oral in cases where the burden of
proof is on the plaintiff, occupies an entirely different
relation to the established principles of law. It has
often been held that uncontradicted oral evidence of
a party holding the burden of proof is not sufficient
to command a directed verdict where the inferences
to be drawn from all the circumstances are open to
different conclusions by reasonable men. "It is not
often, where the party has the burden of proving a
fact by the testimony of witnesses, that the jury can be
required by the court to say that the fact is proved.
They may disbelieve the witness. If the conclusion
is to be reached by drawing inferences from other
facts, ordinarily the jury alone can draw these infer-
ences." [Anthony v. Association, 162 Mass. 354.]
Our own court, however, has taken more advanced
ground on this question than many other courts.
When the allegations of the plaintiff's petition are
denied by answer, and the plaintiff has the burden of
proof, and the evidence introduced by the plaintiff
to sustain the issues on his part is oral and by which
plaintiff has made a prima facie case, the defendant is
nevertheless entitled to have the issue of fact submit-
ted to the jury though the plaintiff's evidence is un-
contradicted and unimpeached and even though de-
fendant introduces no evidence, because uncontra-
dicted testimony cannot be treated as conceded facts.
The jury must determine the credibility of the wit-
nesses and the weight to be given to their testimony.
The court has no right to tell the jury that they shall
believe the witnesses, and when it undertakes to pass
upon their credibility it usurps the functions of the

jury. [Wear v. Hickman, 4 Mo. 106; Vaulx v. Campbell, 8 Mo. 224; McAfee v. Ryan, 11 Mo. 364; Gregory v. Chambers, 78 Mo. 294; Wolff v. Campbell, 110 Mo. 114, 19 S. W. 622; Cleveland & A. M. L. Co. v. Rose, 135 Mo. 101, 36 S. W. 216; Schroeder v. Railroad Co., 100 Mo. 322, 18 S. W. 1094; Huston v. Tyler, 140 Mo. 252, 36 S. W. 654, 41 S. W. 795; Ford v. Dyer, 148 Mo. 529, 49 S. W. 1091; Cannon v. Laclede Gaslight Co., 145 Mo. 502, 46 S. W. 968, 47 S. W. 907. And since the decision of our Supreme Court in the case of Dalton v. City of Poplar Bluff, 173 Mo. 39, 72 S. W. 1058, the law on this subject has never been questioned by that court and has been recognized by the courts of appeals. [Bank v. Hammond, 124 Mo. App. l. c. 181, 101 S. W. 677; McCrosky v. Murray, 142 Mo. App. 133, 125 S. W. 226.] The right of trial by jury in such cases is established by these authorities and placed beyond the intervention of courts. This rule may be stated as follows: In cases where the allegations of plaintiff's petition are denied by answer, although the plaintiff has the burden of proof, yet when he has made out a prima facie case by oral testimony, the court has no authority to sustain defendant's demurrer to plaintiff's evidence, but the plaintiff has the right to go to the jury and have them pass upon the credibility of the witnesses. And under the same conditions, although the plaintiff's witnesses are uncontradicted and unimpeached, and the defendant offers no evidence at all, the court has no right to command a verdict for the plaintiff, but it is the defendant's right to go to the jury and have them pass upon the credibility of the witnesses. The power of the court in such case, where the verdict is not supported by the evidence, is prescribed by the statute which restricts the court to the granting of one new trial. Section 1994, Revised Statutes 1909.

Appellant further assigns as error the giving of the following instruction:

"The court instructs the jury that if you shall find and believe from the evidence in this case and the circumstances surrounding the execution and sale of the note sued upon, that they had been procured from the defendants through fraud, and that the plaintiff at the time he purchased the note, had actual knowledge of such fraud or had knowledge of such facts that his action, in taking such notes, amounted to bad faith, then you will find the issues for the defendant."

Appellant complains that the court by this instruction left to the jury the question as to the meaning of the term, "bad faith." "Good faith" and "bad faith" are questions of law and are not generally understood outside the legal profession; but especially as applied to negotiable paper, these terms are used in a technical sense. In the terminology of legal science, these terms have a well-defined and fixed meaning with which courts and lawyers are familiar, but they are not generally understood by the laity. [Bowles Live Stock Com. Co. v. Hunter, 91 Mo. App. l. c. 337.] But on examination of the appellant's instruction we find that the same error was committed, for his instructions also contain the terms, "good faith" and "bad faith," and as appellant did not ask the court to tell the jury what constituted "good faith" and "bad faith," he was guilty of the same error which he charges that the respondents committed and hence is in no position to complain in the appellate court. [Christian v. Conn. Mut. L. Ins. Co., 143 Mo. 460, 45 S. W. 268; Sawyer v. Walker, 204 Mo. 133, 102 S. W. 544.]

The only evidence in this case in any way tending to impeach the good faith of plaintiff in purchasing the notes was facts and circumstances offered to show that he purchased the same with actual knowledge of the original fraud. Hence instruction No. 2 for defendant should have confined the attention of the jury to such actual knowledge, and the additional clause,

"or had actual knowledge of such facts that his action, in taking such notes, amounted to bad faith," should have been omitted from the instruction as there was no evidence of bad faith except knowledge or notice of the original fraud; and it was confusing and misleading and calculated to divert the attention of the jury from the real issues in the case; and the fact that such clause was in the language of the statute in no way relieved it of its objectionable features.

As this case is subject to retrial under the view we have taken of the law, it is unnecessary for us to comment on the probative force of the evidence offered as to plaintiff's actual knowledge and good faith.

For the reasons herein appearing, the judgment is reversed and the cause remanded. All concur.